EXECUTION VERSION

# PURCHASE AND SALE AGREEMENT

between

## FPMC FORT WORTH REALTY PARTNERS, LP

and

## TEXAS HEALTH RESOURCES

dated as of

April 20, 2016

EXECUTION VERSION

## CONTENTS

ARTICLE I. CONVEYANCE OF THE PROPERTY ....................................................................3

ARTICLE II. PURCHASE PRICE....................................................................................................7

ARTICLE III. CLOSING .................................................................................................................8

ARTICLE IV. TITLE MATTERS..................................................................................................19

ARTICLE V. REPRESENTATIONS AND WARRANTIES........................................................21

ARTICLE VI. RISK OF LOSS .....................................................................................................24

ARTICLE VII. TERMINATION AND DAMAGES.....................................................................25

ARTICLE VIII. ESCROW .............................................................................................................27

ARTICLE IX. BANKRUPTCY MATTERS..................................................................................28

ARTICLE X. MISCELLANEOUS ...............................................................................................29

EXECUTION VERSION

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of April 20, 2016 is entered into between FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership ("**Seller**"), having an address at 2101 Cedar Springs Road, Suite 1540, Dallas, TX 75219 and TEXAS HEALTH RESOURCES, a Texas nonprofit corporation, or an affiliate thereof to be designated pursuant to Section 10.07, "**Purchaser**") having an address at 612 E. Lamar Blvd. Arlington, TX 76011-4127.

## RECITALS

WHEREAS, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "**Bankruptcy Code**") on November 30, 2015, in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), Case No. 15-44791 (the "**Bankruptcy Case**");

WHEREAS, Seller is the owner of the Property (as hereinafter defined);

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property and Purchaser desires to purchase the Property from Seller; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order (defined below) of the Bankruptcy Court;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser (collectively, the "**Parties**") agree as follows:

## ARTICLE I.
## CONVEYANCE OF THE PROPERTY

**Section 1.01. Property.** Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title and interest of Seller in and to the following, including all rights, title, and interests and appurtenances described below, free and clear of all liens, claims, interests and encumbrances as provided in Section 363(f) of the Bankruptcy Code (collectively referred to herein as the "**Property**"):

(a)     that certain tract of real property located in Tarrant County, Texas, more particularly described in **Exhibit A** attached hereto and made a part hereof for all purposes, together with all of Seller's right, title and interest in and to all and singular the rights and appurtenances pertaining to such real property, including any water rights, easements, minerals and mineral interests, royalty interests, working interests, leasehold interests, production payments, utilities and utility commitments, lines, rights, or

recovery charges and other rights and equipment pertaining to any utilities or utility service for the Property (all of the foregoing being hereinafter collectively referred to as the "**Land**");

(b)     all improvements, structures, buildings and fixtures now constructed and completed with respect to and situated on the Land, including without limitation that certain hospital building totaling approximately 150,600 rentable square feet (the "**Hospital**"), that certain 4-story medical office building consisting of approximately 78,808 rentable square feet (the "**MOB**"), together with all of Seller's right, title and interest in all surface parking areas, parking structures, loading dock facilities, landscaping and other improvements, structures and fixtures (all of the foregoing being hereinafter collectively referred to as the "**Improvements**");

(c)     all of Seller's right, title and interest in all fixtures, systems, equipment, machinery, apparatus, appliances, and other articles of personal property, wheresoever located, used in connection with the ownership, use, maintenance, and operation of the MOB and the Hospital, except for the Excluded Personal Property (defined below) (collectively, the "**Personal Property**");

(d)     all of Seller's right, title and interest in all construction warranties issued and construction guaranties with respect to the Property that are capable of being assigned to Purchaser at Closing ("**Construction Warranties**");

(e)     all of Seller's right, title and interest in the following leases and contracts (collectively, the "**Assigned Contracts**"): (i) the leases between Forest Park Medical Center at Fort Worth, L.L.C. (the "**Hospital Operating Company**") and the Seller for the Hospital and the MOB (together, the "**Hospital Operating Company Leases**") including any guarantees, to the extent assignable, and security deposits or prepaid rentals (if any) for the Hospital Operating Company Leases, (ii) the leases for the MOB that are listed in **Exhibit B-1** (the "**MOB Leases**") including any guarantees, to the extent assignable, and security deposits or prepaid rentals (if any) for the MOB Leases, (iii) any other contracts and leases (including any associated deposits or prepaid rentals) listed in **Exhibit B-2** attached hereto, which exhibit may be supplemented and/or modified at any time prior to the Bid Deadline (defined below). For avoidance of doubt, the lease for the MOB by and between Seller and the Hospital Operating Company that is being assumed and assigned to Purchaser is not included in the defined term "MOB Leases" as such term is used throughout this Agreement. Notwithstanding anything herein to the contrary, Seller is not transferring to Purchaser, and Purchaser is not acquiring from Seller, any and all claims that Seller holds against the Hospital Operating Company for unpaid Rents (defined below) due and owing to Seller from the Hospital Operating Company prior to the Effective Date, and Seller shall retain all right title and interest in any such Rents that were due and owing to Seller from the Hospital Operating Company from prior to the Effective Date. To the extent any guarantees referenced in this Section 1.01(e) are not assignable, Seller agrees to assign to Purchaser its right to collect under the guarantees at Closing;

(f)      all of Seller's interests in the records of tenants of the MOB Leases and the Hospital Operating Company Leases in Seller's possession used in the continuing operation of the Improvements excluding all documents that are proprietary or subject to an attorney-client privilege (the "**Tenant Records"**); provided that the Seller may retain copies of any of the Tenant Records;

(g)      all other permits, licenses, and other similar documents, including any pending applications therefor, whether governmental, regulatory or otherwise, relating to the use, operation or maintenance of the Improvements that are capable of being assigned to Purchaser at Closing and approved by Purchaser (the "**Licenses and Permits**"); and

(h)      all other assets owned by the Seller that are necessary and used exclusively in connection with the operation of the Land or Improvements.

**Section 1.02.  Excluded Assets.**  The sale of the Property contemplated by this Agreement shall not include any asset of the Seller not listed in Section 1.01 (collectively, the "**Excluded Assets**").  The Excluded Assets shall include the following assets:

(a)      all cash, cash equivalents, marketable securities, and investments and all bank accounts and lockboxes;

(b)       tenant fixtures or other property belonging to the tenants at the Property;

(c)      all tax deposits, insurance premiums and deposits, other deposits of the Seller held by a third party (unless otherwise specifically provided in this Agreement), refunds owed to Seller by a third party (unless otherwise specifically provided in this Agreement);

(d)      all Rents (defined below) due to Seller under the Hospital Operating Company Leases prior to the Effective Date; and

(e)      the property and contracts described on **Exhibit C**.

**Section 1.03.  Assumed Liabilities**.  Subject to the terms and conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Property to Purchaser, Purchaser will assume and pay, perform and discharge when due and otherwise in accordance with the terms of this Agreement, only the following liabilities of Seller (collectively, the "**Assumed Liabilities**"):

(a)      all liabilities relating to or arising from the Property that accrue on or after the Closing;

(b)      all liabilities of Seller under the Assigned Contracts that accrue on or after the Closing;

(c)      all liabilities of the Seller, if any, in connection with the Licenses and Permits;

(d)     all taxes related to the operation of the Property attributable to taxable periods, or portions thereof, beginning on or after the Closing, including liabilities for taxes attributable to the ownership of the Property from and after the Closing; and

(e)     all liabilities for taxes arising from or with respect to the Property for any time periods, or portions thereof, ending prior to the Closing as to which Purchaser received a Purchase Price credit under this Agreement.

**Section 1.04. Excluded Liabilities.**  Notwithstanding any provision in this Agreement to the contrary, Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any liability of Seller that accrued prior to the Closing, except for the Assumed Liabilities.

**Section 1.05. AS-IS, WHERE-IS.**

(a)     Purchaser expressly acknowledges that the Property is being sold and accepted AS-IS, WHERE-IS AND WITH ALL FAULTS, and, except for Seller's representations and warranties set forth in this Agreement which survive Closing (defined hereafter) and the warranties of title contained in the deed or otherwise in the Closing Documents executed by Seller (collectively, "**Seller's Warranties**"), Seller makes no representations or warranties with respect to the physical condition or any other aspect of the Property, including, without limitation, (i) the structural integrity of any Improvements on the Property, (ii) the manner, construction, condition, and state of repair or lack of repair of any of such Improvements, (iii) the conformity of the Improvements to any plans or specifications for the Property, including but not limited to any plans and specifications that may have been or which may be provided to Purchaser, (iv) the conformity of the Property to past, current or future applicable zoning or building code requirements or the compliance with any other laws, rules, ordinances, or regulations of any government or other body, (v) the financial earning capacity or history or expense history of the operation of the Property, (vi) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise, (vii) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill, susceptibility to landslides, sufficiency of undershoring, sufficiency of drainage, (viii) whether the Land and Improvements are located wholly or partially in a flood plain or a flood hazard boundary or similar area, (ix) the existence or non-existence of asbestos, underground or above ground storage tanks, hazardous waste or other toxic or hazardous materials of any kind or any other environmental condition or whether the Property is in compliance with applicable laws, rules and regulations, (x) the Property's investment potential or resale at any future date, at a profit or otherwise, (xi) any tax consequences of ownership of the Property, or (xii) any other matter whatsoever affecting the stability, integrity, other condition or status of the land or any buildings or improvements situated on all or part of the Property (collectively, the "**Property Conditions**"), and, except for Seller's Warranties, PURCHASER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS PURCHASER MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO ANY WARRANTY OF CONDITION,

HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE RELATING TO THE PROPERTY, ITS IMPROVEMENTS OR THE PROPERTY CONDITIONS, SUCH WAIVER BEING ABSOLUTE, COMPLETE, TOTAL AND UNLIMITED IN ANY WAY. IN DECIDING TO PURCHASE THE PROPERTY, PURCHASER IS RELYING UPON ITS OWN INVESTIGATION OF THE PROPERTY, AND, EXCEPT FOR SELLER'S WARRANTIES, NOT UPON ANY REPRESENTATIONS OR WARRANTIES FROM SELLER OR ITS AGENTS.

(b)     Neither party to this Agreement is relying on any statement or representation not expressly stated in this Agreement. Purchaser specifically confirms and acknowledges that in entering into this Agreement, Purchaser has not been induced by, and has not relied upon, whether express or implied, warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or its uses, the physical condition, environmental condition, state of title, income, expenses or operation of the Property, or any other matter or thing with respect thereto, written or unwritten, whether made by Seller or any agent, employee or other representative of Seller, or any broker or any other person representing (or purporting to represent) Seller, which are not expressly set forth in this Agreement. Seller shall not be liable for or bound by any written or unwritten statements, representations, warranties, brokers' statements or other information pertaining to the Property furnished by Seller, any broker, any agent, employee or other actual (or purported) representative of Seller, or any person, unless and only to the extent the same are expressly set forth in this Agreement.

(c)     Except for any claims arising out of a breach or default by Seller under this Agreement (including a breach of any of Seller's representations and warranties in Article V of this Agreement) or the Closing Documents executed by Seller, the Closing (defined below) hereunder shall be deemed to constitute an express waiver of Purchaser's right to recover from Seller, and forever releases, covenants not to sue and discharges Seller from, any and all damages, demands, claims, losses, liabilities, penalties, fines, liens, judgments, costs or expenses whatsoever, including attorneys' fees and costs, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the physical condition of the Property.

(d)     The provisions of this Section 1.05 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

**ARTICLE II.**
**PURCHASE PRICE**

**Section 2.01.  Purchase Price and Escrow Deposit.**  The purchase price to be paid by Purchaser to Seller for the Property is ONE HUNDRED TWELVE MILLION AND NO/100 DOLLARS ($112,000,000.00) subject to any credits or apportionments as provided for under this Agreement (the "**Purchase Price**"). The Purchase Price shall be payable as follows:

(a)     Within one (1) Business Day after the Effective Date, Purchaser will deliver, the sum of TWO MILLION TWO HUNDRED FORTY THOUSAND AND

N0/100 DOLLARS ($2,240,000.00) (the "**Escrow Deposit**") by cash, check or irrevocable letter of credit, in a form approved by the Seller, to Seller to be delivered to Republic Title at 2626 Howell Street, 10th Floor, Dallas TX, 75204, Attention: Chase Evans ("**Title Company**"), as escrow agent, which Escrow Deposit is only refundable if Purchaser terminates this Agreement on or prior to expiration of the Bid Deadline (defined below) or pursuant to the terms of Article VII of this Agreement. If Purchaser fails to deposit the Escrow Deposit within the time period provided for above, Seller may at any time prior to Title Company's receipt of the Escrow Deposit, terminate this Agreement, in which event this Agreement shall be of no further force and effect and thereafter neither party shall have any further rights or obligations to the other hereunder, except as otherwise set forth in this Agreement.

(b)     The Escrow Deposit shall be held in an interest-bearing escrow account by Title Company in an institution as directed by Seller and reasonably acceptable to Purchaser. All interest and income on the Escrow Deposit will be remitted to the party entitled to the Escrow Deposit pursuant to this Agreement. Any interest earned on the principal portion of the Escrow Deposit shall be deemed to be part of the Escrow Deposit and shall be paid together with the principal portion of the Escrow Deposit, it being understood and agreed that if the transaction contemplated under this Agreement closes, the Escrow Deposit and any interest earned on the Escrow Deposit shall be credited to the Purchase Price upon the Closing or, if this Agreement does not close, the Escrow Deposit will be paid as provided in this Agreement. Title Company is authorized and directed to pay the Escrow Deposit to the party entitled to receive the Escrow Deposit under the terms of this Agreement. Seller or Purchaser, as appropriate, shall deliver a letter of instruction to Title Company directing the disbursement of the Escrow Deposit to the party entitled to receive the Escrow Deposit promptly upon receipt of a demand from that party.

(c)     The balance of the Purchase Price shall be paid to Seller on the Closing Date, subject to any credits or apportionments as provided for under this Agreement, by transfers of immediately available federal funds to an account, or accounts, designated in writing by Seller on the Closing Date.

**ARTICLE III.**
**CLOSING**

**Section 3.01. Closing Date.** The closing of the transaction contemplated by this Agreement (the "**Closing**") will be held through escrow at the offices of the Title Company and shall occur on or before the second Business Day following the satisfaction or waiver by the appropriate Party of all the conditions contained in Section 3.06 (other than those to be satisfied at the Closing) (the date on which the Closing occurs, hereinafter, the "**Closing Date**"). The Parties may mutually agree to extend the Closing Date. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title, and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (Central Time) on the Closing Date.

**Section 3.02. Seller's Closing Deliverables.** At the Closing, Seller shall deliver or cause to be delivered to Purchaser, the following executed, certified and acknowledged by Seller, as appropriate:

(a)     A special warranty deed conveying the Land and Improvements, duly executed and acknowledged by Seller, substantially in the form attached as **Exhibit D**, containing no exceptions or conditions except the Permitted Exceptions (defined below).

(b)     A bill of sale whereby Seller conveys to Purchaser all of Seller's right, title and interest in and to the Personal Property.  The bill of sale will be delivered without any Seller representations or warranties, substantially in the form attached to this Agreement as **Exhibit E.**

(c)     Two (2) counterparts of an Assignment of Leases and Contracts (the "**Assignment of Leases and Contracts**") duly executed by Seller, substantially in the form attached to this Agreement as **Exhibit F**.

(d)     Consent of the governing authority of Seller authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

(e)     A certification that Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code of 1984, as amended and the regulations thereunder, which certification shall be signed under penalty of perjury in substantially the form attached to this Agreement as **Exhibit G**.

(f)     Two (2) counterparts of a notice to tenants (the "**Tenant Notice Letter**"), duly executed by Seller in substantially the form attached to this Agreement as **Exhibit H**, to be duplicated for and addressed to each tenant of the Hospital Operating Company Leases and the MOB Leases promptly after Closing and delivered accordingly by Purchaser after Closing.

(g)     An updated Rent Roll dated no earlier than five (5) days prior to Closing, certified by Seller as being true and correct in all material respects as of the date thereof.

(h)     Originals, or copies certified by Seller as being complete, of all applicable bills, invoices, fuel readings and other items that shall be apportioned as of the Closing Date.

(i)     All original Construction Warranties, Licenses and Permits, certificates of occupancy, the Hospital Operating Company Lease, MOB Leases, Assigned Contracts and Tenant Records, to the extent in Seller's possession, otherwise copies of such documents.

(j)     A counterpart of a closing statement jointly prepared by Seller and Purchaser reflecting the prorations and adjustments required under Section 3.05 of this Agreement and the balance of the Purchase Price due Seller.

9

(k) All keys and access codes to any portion of the Property, to the extent in Seller's possession or control.

(l) To the extent not previously received by Purchaser, original tenant estoppel certificates executed by (the "**Tenant Estoppel Certificates**") all tenants under the MOB Leases. Each required tenant estoppel certificate will be (1) in the form attached to the applicable lease, if any, or if there is no form attached to the applicable lease, then substantially in the form attached hereto as **Exhibit I**, (provided, however, if any applicable lease limits the provisions to be included in any estoppel certificate, the applicable form shall be modified accordingly); and (2) cannot be dated more than fifteen (15) days prior to Closing. The addition of a knowledge qualification to a Tenant Estoppel Certificate with respect to landlord defaults or defaults, defenses, offsets and counterclaims of a tenant in a Tenant Estoppel Certificate will not cause such tenant estoppel certificate to fail to satisfy the requirements for an acceptable Tenant Estoppel Certificate. Any amounts necessary to cure any landlord defaults and liabilities shall be paid out of the Purchase Price and at Closing the portion of the Purchase Price necessary to satisfy the unfunded tenant improvements under the USMD Lease shall be escrowed to satisfy such unfunded tenant improvements.

(m) An assignment and assumption of the Construction Warranties, Licenses and Permits substantially in the form of **Exhibit J** attached hereto and incorporated herein by this reference executed by Seller.

(n) Such evidence as may be reasonably required by the Title Company demonstrating that Seller has the legal power, right and authority to consummate the sale of the Property.

(o) All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement, including such affidavits concerning parties in possession and claims for mechanics' liens as may be reasonably required by Title Company in order to issue the Title Policy (the "**Title Affidavits**") including but not limited to the owner's affidavit (the "**Owner's Affidavit**") substantially in the form attached to this Agreement as **Exhibit K**.

(p) Possession of the Property, subject to the Permitted Exceptions and the rights of tenants in possession under the MOB Leases and the Hospital Operating Company Leases and any other matters authorized herein.

(q) A counterpart to an estoppel certificate from Clearfork Property Association substantially in the form attached hereto as **Exhibit L**, duly executed by Clearfork Ranch, L.P, the declarant of the Clearfork Property Association.

**Section 3.03. Purchaser's Closing Deliverables.** At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following, executed, certified and acknowledged by Purchaser, as appropriate:

(a) The balance of the Purchase Price as set forth in <u>Section 2.01</u>.

(b)    Purchaser shall, where applicable, join with Seller in the execution and delivery of the closing documents and instruments required under Section 3.02 of this Agreement.

(c)    Consent of the governing authority of Purchaser authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

(d)    Two (2) counterparts of the Assignment of Leases, duly executed by Purchaser.

(e)    Counterparts of the Tenant Notice Letters, duly executed by Purchaser.

(f)    A counterpart to an estoppel certificate from Clearfork Property Association substantially in the form attached hereto as **Exhibit L**, duly executed by Purchaser.

(g)    All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement.

## Section 3.04.  Closing Costs.

(a)    Seller and Purchaser shall each pay the fees and expenses of its own counsel in connection with the preparation and negotiation of this Agreement.

(b)    Seller shall pay:

(i)    the costs charged by Title Company, including, without limitation, costs related to the Title Commitment (defined below), and the cost of the premium for the Owner's Title Policy to be issued to Purchaser in the amount of the Purchase Price; provided, however, the costs of any endorsement or modification to the Owner's Title Policy shall be paid by Purchaser;

(ii)    one-half of escrow fees charged by the Title Company;

(iii)    all transfer taxes payable in connection with the transaction contemplated by this Agreement; and

(iv)    all recording fees for the release of any liens on the Property, as required pursuant to the terms of this Agreement.

(c)    Purchaser shall pay:

(i)    one-half of escrow fees charged by the Title Company;

(ii)    the commissions owed to Purchaser's real estate brokers and consultants, if any;

(iii) any other fees or costs related to Purchaser's due diligence reviews; and

(iv) all costs related to the recording fees payable in connection with the recording of the deed and any other documents that the Purchaser may require to be recorded at Closing, if any.

**Section 3.05. Apportionments.** Except as otherwise specifically provided below, all collected rents and all expenses, charges and other obligations relating to the operation of the Property (including, without limitation, real estate taxes and expenses, charges and other obligations under the Assigned Contracts) shall be prorated between Purchaser and the Seller on a per diem basis as of 11:59 P.M. on the date immediately preceding the Closing Date. For purposes of the prorations contained in this <u>Section 3.05</u>, Purchaser shall be deemed to be the owner of the Property for the entire Closing Date. Whether amounts are allocable for the above purposes for the period before or after Closing shall be determined in accordance with generally accepted accounting principles using the accrual method. In furtherance of the foregoing: (i) any bills, invoices or other payments that are apportionable hereunder and that are received by Seller or Purchaser following Closing or otherwise become due following Closing, shall in the first instance be paid by Purchaser, and upon evidence of the payment thereof, Seller shall reimburse Purchaser its apportioned share thereof in accordance with the provisions of this <u>Section 3.05</u>, and (ii) any bills, invoices or other payments that relate exclusively to periods prior to Closing and are received by Seller or Purchaser following Closing or otherwise become due following Closing, shall be sent to Seller and shall be paid for by Seller when due. To the extent possible, the Parties shall undertake to have services or contracts effectively terminated on the Closing Date in order to avoid (to the extent practicable) prorations of such items. In light of the above, the following shall be apportioned as of 11:59 p.m. of the date immediately preceding the Closing Date, unless expressly provided for otherwise:

(a) All rents, additional rents and other charges, including, without limitation, late charges and any other charges due from tenants (collectively, "**Rents**") collected from the tenants of the MOB Leases shall be apportioned on the basis of the number of days of such month the Property will have been owned by Purchaser and Seller, respectively. Purchaser shall be entitled to collect all Rents from any tenants of the Property, except for any rents due under the Hospital Operating Company Leases attributable to periods prior to the Effective Date which shall belong exclusively to Seller. All Rents for the MOB Leases attributable to periods on and after the Closing Date, and all Rents due under the Hospital Operating Company Leases attributable to periods on and after the Effective Date, shall belong to Purchaser. At the Closing, Seller shall deliver to Purchaser a list of any and all tenants who are delinquent in the payment of Rents, the amount of each delinquency and the period of time to which each delinquency is attributable, if any. Seller shall be entitled to a closing credit for all Rents due to Seller at Closing under the MOB Leases. If prior to Closing, Seller received any prepaid rentals and security deposits in connection with the Hospital Operating Company Leases, the MOB Leases, or any other lease that is an Assigned Contract, and if the Seller does not transfer such prepaid rentals and deposits to Purchaser at Closing, then Purchaser shall be entitled to a credit at Closing to the extent any such prepaid rentals and/or security deposits are not delivered to Purchaser at Closing in which case Seller may retain such

prepaid rentals and deposits. Seller shall not pursue an action for damages or collection of any Rents from the tenants under the MOB Leases.

(b)     All real estate and personal property taxes based on the fiscal year for which they are assessed and any assessments applicable to the Property. If the Closing shall occur before a new tax rate is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the preceding fiscal period applied to the latest assessed valuation. If the Property shall be, or has been, affected by any assessments or special assessments payable in a lump sum or which are, or may become, payable in installments, of which the first installment is then a charge or lien, or has already been paid, then at the Closing such amounts will be paid or apportioned, as the case may be in the following manner:

(i)     any such assessments or installments, or portion thereof, payable on or after the Closing Date, other than amounts described in (ii) below but have not been paid, shall be the responsibility of Purchaser.

(ii)     any such assessments or installments, or portion thereof, payable prior to the Closing Date shall be the responsibility of Seller.

(iii)     Notwithstanding the foregoing, (a) Seller is authorized to continue the process of protesting the assessed valuation of the Property related to the 2015 real estate taxes, and Seller shall be entitled to receive any amounts saved as a result of such protest and (b) if Purchaser protests the assessed valuation of the Property related to the 2016 real estate taxes, then Seller shall be entitled to receive from the Purchaser the pro rata amount of the tax savings in accordance with the apportionment principle set forth in this Section 3.05. Notwithstanding Section 10.02, the Purchaser shall pay to Seller any tax savings realized as a result of the successful tax protests described in this subsection within twenty (20) days after both of the following have occurred: (i) the conclusion of the successful protest and (ii) the realization by the Purchaser of the tax savings.

(iv)     To the extent there are any interest or penalties associated with the payment of any taxes, such interest and penalties shall be allocated to the party who is responsible for the payment of such tax to the taxing authority.

(c)     All unpaid property association fees, including without limitation any such existing delinquent fees due and payable, including without limitation, those such delinquent annual assessments due to the Clearfork Property Association (which such delinquent sums shall be charged in full to Seller), and any other amounts, payments or sums due or related to uncured defaults or violations under the Declaration of Covenants, Conditions and Restrictions for Edwards Ranch Clearfork Addition recorded as Instrument #D208439441 in Tarrant County Real Property Records, as amended by the First Amendment to the Declaration of Covenants, Conditions and Restrictions for Edwards Ranch Clearfork Addition recorded as Instrument #D210177329 in the Tarrant County Real Property Records.

(d)      Purchaser and Seller shall cooperatively take all steps necessary to effectuate the transfer of all utilities for the Property from Seller to Purchaser as of the Closing Date, and where necessary, Purchaser will post deposits with the utility companies.  Seller and Purchaser shall cooperate and use commercially reasonable efforts to further ensure that all utility meters, if any, for the Property are read as of the day prior to the Closing Date.  Charges for utilities, if any, serving the Property shall be determined as of the Closing Date, and Purchaser shall be responsible for all utility charges for the period after the Closing Date and Seller shall be responsible for all utility charges for the period prior to and on the Closing Date.  To the extent any such expenses and charges are not determinable as of the Closing Date, such expenses and charges shall be paid promptly upon receipt of an invoice therefor by the party obligated for payment thereof.  Seller shall be entitled to recover any and all deposits held by any utility company for the Property as of the date of Closing.  If the Purchaser does not cause the utilities to be switched over to the Purchaser as of the Closing Date, and the Purchaser does not otherwise cause the utility company(s) to release Seller's deposit(s) within sixty (60) days after the Closing Date, the Purchaser shall reimburse the Seller the amount of such deposit(s) no later than sixty-five (65) days after the Closing Date.  In such event, the deposit(s) will be assigned to Purchaser who shall have rights to have the deposit(s) released to it upon satisfaction of the conditions imposed by the utility company. Operating expenses accrued through the day prior to the Closing Date shall be paid by Seller, and operating expenses attributable to and accruing on the Closing Date and thereafter shall be paid by Purchaser. To the extent any such expenses and charges are not determinable as of the Closing Date, such expenses and charges shall be paid promptly upon receipt of an invoice therefor by the party obligated for payment thereof.

(e)      All other items customarily apportioned in connection with sales of buildings substantially similar to the Property in the State of Texas.

Seller shall deliver to Purchaser and the Title Company proration information sufficient for preparation of the Closing Statement not less than five (5) Business Days prior to Closing Date and Purchaser and Seller shall work in good faith to mutually approve and provide to Title Company a schedule of prorations in as complete and accurate a form as possible.  All demands for reimbursement proration amounts (other than those relating to ad valorem taxes and assessments) must be made within sixty (60) days after the Closing Date and thereafter the prorations made at Closing (adjusted in accordance with timely made demands for reimbursement) will be considered final for all purposes, except for the obligation of the Purchaser under Section 3.05(b)(iii) which will be paid in accordance with Section 3.05(b)(iii).

**Section 3.06.  Conditions to Closing.**

(a)      **Conditions to Seller's Obligations.** Seller's obligation to make the deliveries required of Seller at the Closing Date shall be subject to the satisfaction or waiver by Purchaser of each of the following conditions (the "**Seller's Closing Conditions**"):

(i)        the Bankruptcy Court shall have entered the Sale Order (defined below) and the Sale Order is not subject of a stay (pursuant to Bankruptcy Rule 6004 or otherwise) or appeal as of the Closing;

(ii)        Seller shall have received the total Purchase Price;

(iii)        Seller shall have received all of the items required to be delivered by the Purchaser under Section 3.03;

(iv)        all representations and warranties of the Purchaser contained in the Agreement are true and correct in all material respects as of the date of Closing; and

(v)        any applicable waiting period under the HSR Act has expired or been terminated.

(b)        **Conditions to Purchaser's Obligations.** Purchaser's obligation to make the deliveries required of Purchaser at the Closing Date shall be subject to the satisfaction or waiver by Seller of each of the following conditions (the "**Purchaser's Closing Conditions**," together with the Seller's Closing Conditions, the "**Closing Conditions**"):

(i)        the Bankruptcy Court shall have entered the Sale Order (defined below) in substantially the form attached hereto as **Exhibit N** and there shall have been no material modifications made to the Sale Order and the Sale Order is not subject of a stay (pursuant to Bankruptcy Rule 6004 or otherwise) or appeal as of the Closing;

(ii)        there shall be no uncured material default by the tenant(s) of the MOB Leases except for default(s) by USMD PPM, LLC ("**USMD**") under the lease between the Seller and USMD (the "**USMD Lease**"), such lease shall not have been terminated prior to Closing, and any cures under the USMD Lease shall be paid out of the Purchase Price;

(iii)        Purchaser shall have received all of the items required to be delivered by the Seller under Section 3.02;

(iv)        all representations and warranties of the Seller contained in the Agreement are true and correct in all material respects as of the date of Closing;

(v)        there shall be no material and adverse change in the matters reflected on the Title Commitment, Seller's Survey or the Purchaser's Survey, as applicable, due to Seller's acts or omissions, from those matters appearing therein on the date thereof (except those changes requested by Purchaser in its title objection notice), and no encumbrance or title defect shall affect the Property except the Permitted Exceptions;

(vi)    the environmental condition of the Property on the Closing Date shall not be materially and adversely different from the environmental condition existing as of the Bid Deadline;

(vii)    no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof;

(viii)    any and all secured claims, including mortgages or deeds of trust, shall have been paid off or alternatively the Property shall be sold free and clear of such secured claims under Section 363(f) of the Bankruptcy Code and any secured claims against the Property prior to Closing shall attach to the Seller's sale proceeds;

(ix)    any applicable waiting period under the HSR Act has expired or been terminated; and

(x)    no Material Casualty or Condemnation Event has occurred.

**Section 3.07.  Inspection Period.**

(a)    Purchaser has from the Effective Date until 5:00 p.m. (CT) on date of the Bid Deadline (defined below) (the "**Inspection Period**") to conduct such inspections as Purchaser deems necessary and at its sole cost and expense.  Seller will permit Purchaser and Purchaser's agents and representatives to have reasonable access to enter upon the Property for the purpose of making such tests and inspections; provided Purchaser shall not unreasonably interfere with Seller's use of the Property.  PURCHASER SHALL, AT ITS EXPENSE, REPAIR ANY DAMAGE TO THE PROPERTY CAUSED BY PURCHASER'S INSPECTION OF THE PROPERTY.  PURCHASER HEREBY AGREES TO AND SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD SELLER HARMLESS OF, FROM AND AGAINST ANY AND ALL LIABILITIES, SUITS, CLAIMS, LOSSES, CAUSES OF ACTION, LIENS, FINES, PENALTIES, COSTS AND EXPENSES, INCLUDING, WITHOUT LIMITATION, COURT COSTS, REASONABLE ATTORNEYS' FEES AND COSTS, AND DAMAGES SUSTAINED BY SELLER OR THE PROPERTY (COLLECTIVELY "**CLAIMS**"), INCLUDING, BUT NOT LIMITED TO, INJURY TO OR DEATH OF ANY PERSON OR DAMAGE TO OR THEFT OF ANY PROPERTY, OR MECHANICS' AND MATERIALMEN'S LIENS, CAUSED AS A RESULT OF OR ARISING OUT OF OR IN CONNECTION WITH ANY INSPECTIONS OR EXAMINATIONS CONDUCTED BY PURCHASER OR ITS CONTRACTORS OR AGENTS EVEN IF SUCH CLAIMS ARISE FROM THE CONCURRENT NEGLIGENCE OF SELLER; PROVIDED, HOWEVER, THAT THE FOREGOING INDEMNITY SHALL NOT APPLY IN CONNECTION WITH ANY MATTERS CONCERNING THE CONDITION OF THE PROPERTY OR THE PROPERTY'S    COMPLIANCE    WITH    APPLICABLE    LAWS    THAT    ARE

UNCOVERED OR DISCOVERED BY PURCHASER OR ITS CONTRACTORS OR AGENTS IN CONDUCTING THEIR INSPECTIONS AND EXAMINATIONS HEREUNDER. ADDITIONALLY, PURCHASER'S INDEMNIFICATION OBLIGATIONS HEREUNDER DO NOT APPLY TO ANY CLAIMS ARISING SOLELY FROM SELLER'S NEGLIGENT ACT OR WILLFUL MISCONDUCT. THIS INDEMNIFICATION OBLIGATION SHALL SURVIVE THE CLOSING AND ANY TERMINATION OF THIS AGREEMENT.

(b)     Purchaser may engage an independent environmental consultant, at its cost, to conduct an environmental assessment of the Property to determine the current environmental status of the Property so that any such environmental assessment is completed before the end of the Inspection Period. SELLER SHALL REMAIN RESPONSIBLE FOR AND SHALL INDEMNIFY PURCHASER FROM ALL LIABILITY ARISING DIRECTLY FROM THE RELEASE OR CONTAMINATION FROM THE PROPERTY RELATING TO HAZARDOUS MATERIALS EXISTING THEREON PRIOR TO THE DATE OF CLOSING, PROVIDED FURTHER, THAT SELLER SHALL NOT BE RESPONSIBLE FOR AND PURCHASER SHALL BE RESPONSIBLE FOR ANY LIABILITY ARISING DIRECTLY FROM THE RELEASE OR CONTAMINATION IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PURCHASER OR ITS REPRESENTATIVES OR AGENTS.

(c)     Seller has provided Purchaser access to Seller's virtual data room as of the Effective Date. The Seller's virtual data room contains certain documents that may include the following: "as built" plans, other plans specifications and drawings, surveys, permits, engineering reports, operating reports, capital expenditure history, aging reports, tax bills, building permits, occupancy permits, maintenance and service records, leases, a current rent roll, contracts, environmental reports and other documents and information pertaining to the ownership, use, operation, maintenance and condition of the Property. Seller shall use its best efforts to obtain copies of any other documents as may be reasonably requested by the Purchaser during the Inspection Period related to the transactions under this Agreement.

(d)     During the Inspection Period, Seller shall permit Purchaser the right to meet with tenants of leases of the Property to discuss tenant's tenancy.

(e)     Purchaser shall have the right in its sole discretion and for any reason or no reason whatsoever to terminate this Agreement at any time prior to expiration of the Inspection Period by timely providing written notice to Seller of its termination of this Agreement, whereupon the Escrow Deposit shall be delivered to Purchaser and neither party hereto will have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. If on or before the last day of the Inspection Period the Title Company and the Seller do not receive written notice from Purchaser terminating this Agreement during the Inspection Period, Purchaser shall be deemed to have elected not to terminate this Agreement and the full Escrow Deposit and the accrued interest thereon shall only be refundable pursuant to the terms of Article VII of this Agreement.

17

(f)     If this Agreement has been terminated in accordance with, and subject to the terms of this Section, the Parties shall thereupon be relieved of all liabilities and obligations hereunder, excluding indemnification obligations and any other provisions that expressly survive termination under the terms of this Agreement.

**Section 3.08.  Hart-Scott-Rodino**.  Each Party hereto agrees to make any appropriate filings that may be required pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("**HSR Act**") with respect to the transactions contemplated by this Agreement within five (5) Business Days after the entry of the Bid Procedures Order (defined below) with the Federal Trade Commission and the Antitrust Division of the Department of Justice (individually or together, the "**Antitrust Agencies**"), and to cooperate with the other party in preparing and submitting filings and responding to any questions raised by the Antitrust Agencies relating to the filings, and to supply as promptly as practicable to the Antitrust Agencies any additional information and documentary material that may be requested pursuant to the HSR Act.  Purchaser shall promptly pay all filing fees required by the HSR Act and the applicable regulations related thereto.  Purchaser will not be entitled to any proration, credit or reimbursement of any such amounts paid notwithstanding whether or not Closing occurs, except as provided in Section 9.06 of this Agreement.   To the extent reasonably practicable, all analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before the Antitrust Agencies or the staff or regulators of the Antitrust Agencies, in connection with the transactions contemplated hereunder shall be disclosed to the other Party hereunder in advance of any filing, submission or attendance, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. To the extent practicable, each Party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with the Antitrust Agencies, with such notice being sufficient to provide the other Party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

**Section 3.09.  Hospital Operating Company Release.** During the Inspection Period, Seller shall provide Purchaser a form of mutual release (the "**Release**") that provides that the Seller and the Hospital Operating Company are releasing one another and each Parties' affiliates and representatives of claims and causes of action relating to the Hospital Operating Company Leases that either the Seller or the Hospital Operating Company hold against the other and such other terms as the Seller may reasonably request.  If the Hospital Operating Company executes the Release at or prior to Closing, then Seller will execute the Release at Closing and the Parties and the Hospital Operating Company Shall be bound by the terms of the Release.  If the Hospital Operating Company does not execute the Release at or prior to Closing, then nothing herein shall preclude Seller from asserting separate and independent claims against the Hospital Operating Company, including, without limitation, (i) the institution of such actions and proceedings as Seller shall deem necessary and advisable for the purpose of collecting any rent under the Hospital Operating Company Leases that was due to Seller prior to the Effective Date, and (ii) any and all avoidance actions under chapter 5 of the Bankruptcy Code against the Hospital Operating Company.  For avoidance of doubt, the terms in this Section 3.09 are not a Closing Condition.

## ARTICLE IV.
## TITLE MATTERS

**Section 4.01.  Conveyance.** At the Closing, Seller will convey to Purchaser fee simple indefeasible title to the Land and the Improvements by a special warranty deed and title to the Personal Property by a bill of sale, all free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions (defined below) and any items that may be approved by the Purchaser.

**Section 4.02.  Permitted Exceptions.** The Property shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, subject to all matters now or hereafter shown on the Title Commitment (other than Schedule C matters), title exception documents, or the Seller's Survey or Purchaser's Survey: (i) to which Purchaser does not timely object or (ii) to which Purchaser does timely object but which Seller does not cure or agree to cure in writing, (iii) the lien of all ad valorem real estate taxes, lienable utility services and assessments not yet due and payable as of the Closing Date, and (iv) the rights of any tenants and other parties in possession of the Property or any portion thereof (collectively, the "**Permitted Exceptions**")

**Section 4.03.  Title.**

(a)    On the Effective Date, Purchaser will provide Seller, at its sole cost and expense, a current TLTA form commitment for title insurance (as may be revised from time to time, the "**Title Commitment**") issued by the Title Company, which shall set forth the state of title to the Land and the Improvements.

(b)    Seller shall promptly provide to Purchaser a copy of Seller's survey made by Kimley Horn and Associates, Inc. in 2014 identified as Project No. 061274512 ("**Seller's Survey**").  Purchaser, at Purchaser's sole cost and expense, shall have the right to obtain a new or recertified survey of the Land and Improvements (the "**Purchaser's Survey**") prepared by a surveyor licensed in the state of Texas and approved by Seller.

(c)    Purchaser shall deliver to Seller and Seller's attorney, in writing, any objections to the exceptions to title set forth in the Title Commitment, Seller's Survey and Purchaser's Survey, other than the Permitted Exceptions (collectively, "**Title Objection Notice**"), by no later than 5:00 P.M. (Central Standard Time) on the date that is five (5) Days prior to the Bid Deadline ("**Title Objection Date**").  The failure by Purchaser to deliver the Title Objection Notice on or before the Title Objection Date shall constitute Purchaser's irrevocable acceptance of the Title Commitment and Seller's Survey and Purchaser shall be deemed to have unconditionally waived any right to object to any matters set forth therein.

(d)    Seller is under no obligation to cure any objections in the Title Objection Notice, save and except any items listed, including without limitation those certain current mechanic's liens against the Property, in Schedule C of the Title Commitment.  If Seller does not remove or otherwise resolve the Purchaser's objections set forth in the Title Objection Notice to Purchaser's satisfaction by the day immediately prior to the Bid

Deadline (the "**Cure Period**"), then Purchaser shall have the right to choose one of the following, as its sole and exclusive remedy: (i) close escrow subject to any such objections, without any change in Purchaser's obligations under this Agreement and with no reduction in the Purchase Price, or (ii) terminate this Agreement on or before the Bid Deadline; *provided, however,* if any such objection consists of one or more monetary liens or Items listed on <u>Schedule C</u> of the Title Commitment, then Seller will have an obligation to either (i) pay (at or prior to Closing) any amount due in satisfaction or release of such monetary lien(s) or (ii) cause the Property to be sold free and clear of such liens or Items in <u>Schedule C</u> under Section 363(f) of the Bankruptcy Code and have such liens or Items attach to the sale proceeds by operation of the Sale Order.

(e)     From and after the date hereof, Seller shall not execute any deed, easement, restriction, covenant or other matter affecting title to the Property unless Purchaser has received a copy thereof and has approved the same in writing. If Purchaser fails to approve in writing any such proposed instrument within five (5) Business Days after receipt of the aforementioned notice, Purchaser shall be deemed to have disapproved the proposed instrument.  Purchaser's consent shall not be unreasonably withheld, conditioned or delayed with respect to any such instrument that is proposed prior to the expiration of the Inspection Period.  Purchaser, in its sole and absolute discretion, shall be entitled to grant or withhold its consent with respect to any such instrument that is proposed between the Bid Deadline and the Closing.

(f)     Upon Closing, the Title Company shall issue the Owner's Title Policy to Purchaser, insuring that fee simple title to the Land and Improvements is vested in Purchaser subject only to the Permitted Exceptions.  Purchaser shall be entitled to request that the Title Company provide such endorsements (or amendments) to the Owner's Title Policy as Purchaser may reasonably require, provided that such endorsements (or amendments) shall be at no cost to, and shall impose no additional liability on, Seller except, in each case, if (i) such endorsements are issued for purposes of removing an exception and (ii) Seller agrees to pay for such endorsements.

**Section 4.04.  Violations.** Notwithstanding anything to the contrary in this Agreement, Purchaser shall accept title to the Property subject to any and all violations or any notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued prior to, on or after the date of this Agreement (collectively, the "**Violations**"), if any.  Purchaser acknowledges and accepts that Seller shall not be obligated to comply with, or take any action or incur any expense in connection with any Violations, except as otherwise provided in this Agreement with regard to the payment of the amounts owed to the Clearfork Property Association pursuant to section 3.05(c) of this Agreement. If requested by Purchaser, Seller shall furnish Purchaser with an authorization to make any required violation searches against the Property.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

**Section 5.01. Seller's Representations and Warranties.** Seller represents and warrants to Purchaser on and as of the date of this Agreement and on and as of the Closing Date as follows:

(a)  Seller is a duly organized, validly existing limited partnership in good standing under the laws of the State of Texas and is authorized to conduct business in the State of Texas.

(b)  Subject to Bankruptcy Court approval, this Agreement has been duly authorized, executed and delivered by Seller, and is and at the time of the Closing will be a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(c)  Subject to Bankruptcy Court approval, the execution and delivery of this Agreement, the consummation of the transactions provided for herein and the fulfillment of the terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, any agreement of Seller or any instrument to which Seller is a party or by which Seller or the Property are bound, or any judgment, decree or order of any court or Governmental Authority or any applicable laws.

(d)  All Rents due to Seller under the MOB Leases are current as of April 31, 2016.

(e)  The Property is not subject to any leases, tenancies, or other rights of occupancy for space other than the MOB Leases and the Hospital Operating Company Leases. The list of the existing leases set forth on **Exhibit B-2** is a true, accurate and complete list of all of the MOB Leases. Except as disclosed on **Exhibit B-2** and the approximate $3,392,751.00 unfunded tenant improvements for the USMD Lease, there are no tenant improvement obligations that have or may accrue under the MOB Leases for the current term thereof that have not been satisfied. To Seller's actual Knowledge, each MOB Lease is in full force and effect, and Seller has not received any written notice of a default from any tenant that remains uncured, nor sent any written notice of default to any tenant that remains uncured, except for potential defaults in connection with the USMD Lease that are addressed in the certain stipulation between the Seller and USMD as filed with the Bankruptcy Court at docket number 45.

(f)  Except for the contracts identified on **Exhibit B** (each of which shall continue to be in full force and effect as of the Closing), service contracts provided in the data room, the Permitted Exceptions and other agreements contemplated by this Agreement, there are no contracts of any kind or description in existence that will survive Closing for which Purchaser shall be responsible, provided, however, that unless Purchaser accepts assignment of the service contracts provided in the data room it shall have no responsibility for such service contracts.

(g)     To Seller's actual Knowledge, there are no Violations with respect to the Property.

(h)     There is no agent, broker, finder, or investment or commercial banker, or other person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, that is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

(i)     Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code or any regulations promulgated thereunder, as amended.

(j)     Except for proceedings before the Bankruptcy Court, to Seller's actual Knowledge, (i) there is no pending or threatened litigation or condemnation action against the Property or against Seller with respect to the Property as of the date of this Agreement, except for the proceeding before the Bankruptcy Court and any claims made therein; and (ii) there are no pending or threatened injunctions, judgments, decrees, rulings, consents, approvals, writs, assessments or arbitration awards of a Governmental Authority outstanding against Seller or that otherwise relate to or may affect the Property, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, the transactions contemplated hereby, except for that certain tax protest proceeding for 2015 real property taxes.

(k)     Seller has not received any written notice from any Governmental Authority alleging that the Property is in violation of any applicable environmental law or any applicable building code.

(l)     To Seller's actual Knowledge, Seller has complied with all applicable laws, ordinances, regulations, statutes, codes, rules, orders, decrees, determinations, covenants and restrictions relating to the Property and every part thereof (hereinafter collectively referred to as the "**Applicable Laws**" or individually, "**Applicable Law**") including those promulgated or imposed by any agency, department, commission, board, bureau or instrumentality of any governmental authority of the United States, the State of Texas, the County of Tarrant, the City or any other local authority (hereinafter collectively referred to as the "**Governmental Authorities**", or individually, a "**Governmental Authority**").

(m)     Seller does not own any patents, trade secrets, copyrights, inventions, franchises, logos, trade names, trademarks, service marks, telephone numbers, websites, domain names or advertising materials used in connection with the Property and the business operated thereon, nor does Seller own any websites and Google accounts that relate to the Improvements.

For the purposes hereof, "Seller's actual Knowledge" means the knowledge of Todd Furniss.

**Section 5.02. Purchaser's Representations and Warranties** Purchaser represents and warrants to Seller on and as of the date of this Agreement and on and as of the Closing Date as follows:

(a)     Purchaser is a Texas non-profit corporation duly organized, validly existing and in good standing under the laws of the State of Texas.

(b)     This Agreement has been duly authorized, executed and delivered by Purchaser, and is and at the time of the Closing will be a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

(c)     Other than KOA Brokerage, LLC, no agent, broker, finder, or investment or commercial banker, or other person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

(d)     Purchaser has not violated any contract, agreement or other instrument to which Purchaser is a party nor any judicial order, judgment or decree to which Purchaser is bound by: (i) entering into this Agreement; (ii) executing any of the documents Purchaser is obligated to execute and deliver on the Closing Date or (iii) performing any of its duties or obligations under this Agreement or otherwise necessary to consummate the transactions contemplated by this Agreement.

(e)     There are no actions, lawsuits, litigation or proceedings pending or threatened in any court or before any governmental or regulatory agency that affect Purchaser's power or authority to enter into or perform this Agreement.  There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, or, to the best of Purchaser's knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)     Purchaser has not (i) commenced a voluntary case, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its property, or (iii) made an assignment for the benefit of creditors.

(g)     Purchaser is not (i) a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the OFAC of the Department of the Treasury (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), regulation or other governmental action (ii) a "specially designated global

terrorist" or other person listed in Appendix A to Chapter V of 31 C.F.R., as the same has been from time to time updated and amended, or (iii) a person either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R., Part 515 or (B) designated under Sections 1(a), 1(b), 1(c), or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or a person similarly designated under any related enabling legislation or any other similar executive orders.

(h)      Purchaser has taken measures as required by law to assure that (i) funds to be used to pay the Purchase Price and (ii) with respect to each holder of a direct interest in Purchaser, funds invested by such holders in Purchaser, are derived from legal sources and such measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and all applicable laws, regulations and government guidance on compliance therewith and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957.

**Section 5.03.  Operating Covenants.** Seller shall cause the Property to be maintained in substantially the same manner as prior to the Effective Date of this Agreement pursuant to Seller's normal course of business, consistent with prior practices, making all reasonable and ordinary maintenance repairs resulting from the breakdown or improper functioning of a particular item or system which is required to keep the Property in substantially the same condition as on the date hereof, including ordering and maintaining on hand sufficient materials, supplies, fuel and other personal property necessary for the efficient operation and management of the Property through the Closing Date, subject to reasonable wear and tear and Article VI of this Agreement; provided that Seller shall not be obligated to perform any capital improvements or capital repairs to any part of the Property.  Seller shall not enter into any new contracts or leases (or renewals, modifications or amendments of existing contracts or leases) without the prior written consent of Purchaser, such consent not to be unreasonably withheld, conditioned or delayed, provided however, Seller shall have the right to enter into contracts which may be terminated on not more than thirty (30) days' notice without payment of any termination fee. Seller shall maintain property and liability insurance on the Property until the Closing Date with substantially the same coverage as in effect on the date of this Agreement.

**ARTICLE VI.**
**RISK OF LOSS**

**Section 6.01.  Risk of Loss.** If after the Effective Date and prior to the Closing Date any material portion of the Property shall be taken by condemnation or eminent domain or damaged or destroyed by fire or other casualty, the risk of such loss remains with the Seller (a "**Material Casualty or Condemnation Event**").  In the event of an occurrence of a Material Casualty or Condemnation Event, Purchaser shall have the option to terminate this Agreement and receive the Escrow Deposit or proceed to closing with no deduction from the Purchase Price, provided that the Seller shall assign any applicable insurance or condemnation proceeds to Purchaser.

EXECUTION VERSION

## ARTICLE VII.
## TERMINATION AND DAMAGES

**Section 7.01. Right of Termination.** Notwithstanding anything else herein, after the Bid Deadline, this Agreement may be terminated only as provided in this <u>Article VII</u>. In the case of any such termination that is not automatic pursuant to <u>Section 7.02(b)</u> below, the terminating Party shall give proper written notice to the other Party specifying the provision pursuant to which the Agreement is being terminated.

**Section 7.02. Termination Rights.** This Agreement may be terminated at any time before Closing:

 (a) by mutual written consent of Seller and Purchaser;

 (b) automatically and without any action or notice by Seller to Purchaser, or Purchaser to Seller:

  (i) upon the issuance of a final and non-appealable order by a Governmental Authority to restrain, enjoin, or otherwise prohibit the transfer of the Property contemplated hereby;

  (ii) upon entry of a final and non-appealable order appointing a chapter 11 trustee, converting Seller's Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissing Seller's Bankruptcy Case; or

  (iii) in the event Purchaser's final bid is not declared the Successful Bid upon completion of the Auction and upon consummation of an Alternative Transaction;

 (c) by the Purchaser:

  (i) if the Purchaser is not in material breach of this Agreement and Seller has breached a representation, warranty, or covenant or otherwise failed to observe or perform any other term contained in this Agreement, and (A) that breach or failure to perform has not been waived by the Purchaser, and (B) Seller has failed to cure that breach or failure to perform within three (3) calendar days following receipt of notification thereof by the Purchaser;

  (ii) if the Sale Order with respect to the transactions contemplated in this Agreement has not been entered on or before the sixtieth (60th) day following the Effective Date, in substantially the form attached hereto as **Exhibit N** and there shall have been no material modifications made to the Sale Order, or such later date as mutually agreed to by the Parties, if such non-entry is not caused by or the result of Purchaser's material breach of this Agreement; or

  (iii) if a Material Casualty or Condemnation Event occurs prior to Closing;

(d)     by the Seller:

(i)     if Seller is not in material breach of this Agreement and Purchaser has breached any representation, warranty, or covenant or otherwise failed to observe or perform any other term contained in this Agreement, and (A) that breach or failure to perform has not been waived by Seller, and (B) Purchaser has failed to cure that breach or failure to perform within three (3) calendar days following receipt of notification thereof by Seller;

(ii)     if the Sale Order with respect to the transactions contemplated in this Agreement has not been entered on or before the sixtieth (60th) day following the Effective Date, or such later date as mutually agreed to by the Parties, if such non-entry is not caused by or the result of Seller's material breach of this Agreement;

(iii)     at any time after five (5) days following the issuance by the Antitrust Agencies of a request for additional information or documentary material during the initial HSR Act 15-day waiting period if the Seller is not in material breach of this Agreement; or

(iv)     at any time after fifteen (15) days following the entry of the Sale Order by the Bankruptcy Court, if the Closing shall not have occurred and such failure to close is not caused by or the result of Seller's material breach of this Agreement.

**Section 7.03.  Effects of Termination/Damages.**

(a)     In the event this Agreement is terminated pursuant to Section 7.02(a), (b), (c), (d)(ii), (d)(iii), or (d)(iv) above, the Escrow Deposit shall be delivered to the Purchaser by the Escrow Agent.  This shall be the Purchaser's sole and exclusive remedy for such termination.  Thereafter, both Parties shall be relieved of and released from any further liability hereunder, and neither Party will have any liability or obligations arising under or in connection with this Agreement except for any obligation that expressly survives termination of this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall Seller be liable to Purchaser for any damages.

(b)     In the event the Seller terminates this Agreement pursuant to Section 7.02(d)(i) above, the Escrow Deposit shall be delivered to the Seller by the Escrow Agent in accordance with the Escrow Agreement, and the Seller shall retain the Escrow Deposit as the sole and exclusive remedy for such termination and as liquidated damages with respect to such default.  Thereafter, both Parties shall be relieved of and released from any further liability hereunder, and neither Party will have any liability or obligations arising under or in connection with this Agreement except for any obligation that expressly survives termination of this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall Purchaser be liable to Seller for any damages, except for liquidated damages in the amount of the Escrow Deposit.

SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE ESCROW DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW. THIS SECTION DOES NOT LIMIT THE SELLER'S RIGHTS TO INDEMNIFICATIONS IN THIS AGREEMENT.

(c)     If Seller shall default in the observance or performance of any of the terms of this Agreement, and Purchaser is ready, willing, and able to close in accordance with the terms, provisions and conditions of this Agreement and the Closing does not occur as a result thereof (a "**Seller Default**"), Purchaser shall elect as its exclusive remedy either (i) terminate this Agreement and obtain return of the Escrow Deposit plus any accrued interest thereon, or (ii) specific performance.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall Seller be liable to Purchaser for any damages.

## ARTICLE VIII.
## ESCROW

**Section 8.01. Escrow Terms.** Title Company shall hold and disburse the Escrow Deposit in accordance with the following provisions:

(a)     Title Company shall hold the Escrow Deposit in a federally insured interest-bearing account, and shall not be liable for any losses suffered in connection with any such investment.

(b)     If the Closing occurs, then the Title Company shall deliver the Escrow Deposit to Seller.

(c)     If for any reason the Closing does not occur and either party makes a written demand upon Title Company for payment of the Escrow Deposit, the Title Company shall give written notice to the other party of such demand.  If the Title Company does not receive a written objection from the other party to the proposed payment within five (5) days after the giving of such notice, the Title Company is hereby authorized to make such payment.  If the Title Company does receive such written objection within such five (5) day period or if for any other reason the Title Company in good faith shall elect not to make such payment, the Title Company shall continue to hold such amount until otherwise directed by written instructions from the Parties or a final judgment in the Bankruptcy Court.  However, the Title Company shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Bankruptcy Court.  The Title Company shall give written notice of such deposit to Seller and Purchaser.  Upon such deposit, the Title Company shall be relieved and discharged of all further obligations and responsibilities as an escrow agent hereunder.

## ARTICLE IX.
## BANKRUPTCY MATTERS

**Section 9.01.  Bankruptcy Court Approval.** Seller's obligations under this Agreement are subject to the Bankruptcy Court having entered the Bid Procedures Order, substantially in the form attached to this Agreement as **Exhibit M**.

**Section 9.02.  Bid Procedures.**  This Agreement is subject to consideration by Seller of higher or better competing bids in accordance with bid procedures substantially in the form of bid procedures attached as **Exhibit 1** to the Bid Procedures Order (the "**Bid Procedures**").  The terms "**Alternative Transaction**", "**Auction**", "**Bid Deadline**", "**Successful Bid**", "**Successful Bidder**" "**Qualified Bids**", and "**Qualified Bidders**" have the meanings assigned to such terms in the Bid Procedures.

**Section 9.03.  Sale Order.**  Following the conclusion of the Auction (or after the Bid Deadline if there are no other Qualified Bidders), Seller shall use its best efforts to promptly obtain the entry of an order (the "**Sale Order**") of the Bankruptcy Court approving the Successful Bid, substantially in the form attached to this Agreement as **Exhibit N**.

**Section 9.04.  Sale Procedures Motion.**  Promptly after the Effective Date, the Seller shall file a motion with the Bankruptcy Court seeking authority to sell the Property under the terms of this Agreement (the "**Sale Procedures Motion**"), substantially in the form attached to this Agreement as **Exhibit O**.

**Section 9.05.  Cooperation in Bankruptcy Matters**

(a)  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making its representatives available to be interviewed by Seller's attorneys and to testify before the Bankruptcy Court and at depositions.

(b)  If a written objection is filed to the motion seeking approval of this Agreement, which is an objection that would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Seller and Purchaser shall use best efforts to have such objection overruled.

(c)  In the event the Sale Order is appealed, Seller and Purchaser shall each use their respective best efforts to defend such appeal or, by mutual written agreement, close the transactions contemplated hereby unless such closing is stayed by the Bankruptcy Court.

**Section 9.06.  Reimbursement of HSR Act Filing Fee.**  Seller shall seek authority in the Bid Procedures Order to reimburse any Qualified Bidder (including the Purchaser) who is not the Successful Bidder at the Auction an amount not to exceed FORTY-FIVE THOUSAND AND NO/100 DOLLARS ($45,000.00) for the Qualified Bidder's reasonable out-of-pocket

documented expenses incurred in connection with any HSR Act filing fee incurred hereunder with such amount to be paid only upon consummation of this Purchase Agreement or an Alternative Transaction.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01. Governing Law.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Texas in accordance with the laws applicable to contracts executed in such state (without giving effect to the principles of conflicts of laws thereof), provided that the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the laws of the jurisdiction in which such property is located. Without limiting any party's right to appeal any order of the Bankruptcy Court, the Parties agree that the Bankruptcy Court shall retain sole jurisdiction over any legal action or proceeding with respect to this Agreement and Seller. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby; provided, however, that if the Bankruptcy Case has been fully and finally dismissed and/or the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of Texas. If that court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the Texas courts located in Tarrant County, Texas. In addition, the Parties irrevocably consent to service of process by delivering a copy of the process to such person to the address provided pursuant to Section 10.04 of this Agreement by federal express or other overnight courier for overnight delivery or by certified mail, postage prepaid.

**Section 10.02. No Survival.** Except for the Purchaser's obligation under Section 3.05(b)(iii), all representations, warranties, covenants or other obligations of the Parties contained in, or arising out of, this Agreement shall survive the Closing hereunder for a period of six (6) months after the Closing Date (the "**Survival Period**") as provided in this Section. If any claim for a breach of a representation, warranty, covenant, or other obligation is not made prior to the expiration of the Survival Period, then such claim shall be forever waived and barred, regardless of whether either the Seller or the Purchaser had knowledge of such claim or the facts giving rise to such claim before the expiration of the applicable survival period. If the party asserting a claim under, or arising out of, this Agreement (the "**Claiming Party**") provides notice to the other party of a claim prior to the end of the Survival Period, then the Claiming Party shall be required to file suit on such claim within ninety (90) days after such notice of claim is delivered to the other party (unless such claim has been mutually resolved in writing prior to the expiration of such ninety (90) day period), otherwise such claim shall be forever waived and barred. If the Claiming Party provides notice of a claim prior to the end of the Survival Period and files suit on such claim in accordance with the immediately preceding sentence, then the liability for such claim will continue until the claim is fully resolved. Notwithstanding anything else herein, in no event shall a party's aggregate net liability to the other party for any breach of the representations, warranties, covenants or other obligations of

the Parties exceed the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), plus any legal fees incurred by Purchaser in connection with the collection of such amount.

Section 10.03. **Business Days.** Whenever any action must be taken (including the giving of notices) under this Agreement during a certain time period (or by a particular date) that ends or occurs on a non-business day, then such period (or date) shall be extended until the next succeeding business day.  As used herein, the term "**Business Day**" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in Fort Worth, Texas are not required or authorized to be closed for business.

Section 10.04. **Notices.**  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given:  (a) on the day of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained; (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below; (d) on the Business Day of delivery to Federal Express or similar overnight courier for overnight delivery; or (e) on the date of postmark, if mailed to the party to whom notice is to be given by first class, registered, or certified mail, with postage prepaid, to the party as follows, so long as a copy is also sent the same day under subsection (a), (b), (c) or (d):

| | |
|---|---|
| If to Seller: | FPMC Fort Worth Realty Partners, LP |
| | c/o Mary Hatcher |
| | 2101 Cedar Springs Road, Suite 1540, |
| | Dallas, TX 75219 |
| | Email: MHatcher@glendonTodd.com |
| | |
| With a copy to: | Diamond McCarthy LLC |
| | 909 Fannin, 15th Floor |
| | Two Houston Center |
| | Houston, TX  77010 |
| | Attn:  Charles M. Rubio |
| | Email:  crubio@diamondmccarthy.com |
| | |
| | *and* |
| | |
| | Melissa S. Hayward |
| | Franklin Hayward LLP |
| | 10501 N. Central Expressway, Ste. 106 |
| | Dallas, TX 75231 |
| | Email: mhayward@franklinhayward.com |
| | |
| If to Purchaser: | Texas Health Resources |
| | Attn: Jon Sullivan |
| | 612 E. Lamar Blvd., Suite 200 |
| | Arlington, TX 76011-4127 |

| | |
|---|---|
| With a copy to: | Deborah M. Perry |
| | Munsch Hardt Kopf & Harr, PC |
| | 500 N. Akard Street |
| | Suite 3800 |
| | Dallas, TX 75201-6659 |
| | TEL: 214.855.7565 |
| | Email: dperry@munsch.com |
| | |
| If to Title Company: | Republic Title |
| | 2626 Howell Street, 10th Floor |
| | Dallas TX 75204, |
| | TEL: 214-754-7780 |
| | FAX: 214-855-8848 |
| | Attention: Chase Evans |

Any Party may change its address for the purpose of this <u>Section 10.04</u> by giving the other parties written notice of its new address in the manner set forth above.

**Section 10.05. Modifications and Amendments.** This Agreement cannot under any circumstance be modified or amended orally and no agreement shall be effective to waive, change, modify, terminate or discharge this Agreement, in whole or in part, unless such agreement is in writing and is signed by both Seller and Purchaser.

**Section 10.06. No Recording.** Neither this Agreement, nor any memorandum of this Agreement, shall be recorded. The recording of this Agreement, or any memorandum of this Agreement, by Purchaser shall constitute a material default and shall entitle Seller to retain the Escrow Deposit and any interest earned thereon.

**Section 10.07. Successors and Assigns; Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs or successors and assigns. Purchaser may assign its rights and obligations under this Agreement without the prior written consent of the Seller, provided that Purchaser provides Seller notice of such assignment no later than the Bid Deadline. If Purchaser assigns its rights and obligations to more than one entity in accordance with this Section, then Seller shall deliver one or more special warranty deeds, bills of sale, and Assignments of Leases and Contracts at Closing as may be reasonably requested by the Purchaser for the purpose of allocating the conveyance of the Property between the entities.

**Section 10.08. Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect, invalidate or render unenforceable any other term or provision of this Agreement. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**Section 10.09. Further Assurances.** At the Closing and at all times thereafter as may be necessary, each of the Parties shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby, provided such documents are customarily delivered in real estate transactions in Texas and do not impose any material obligations upon any party hereunder except as set forth in this Agreement.

**Section 10.10. Counterparts.** This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute but one and the same instrument.

**Section 10.11. Headings.** The captions or paragraph titles contained in this Agreement are for convenience and reference only and shall not be deemed a part of the text of this Agreement.

**Section 10.12. No Waivers.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party providing the waiver. No waiver by either party of any failure or refusal to comply with any obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

**Section 10.13. Waiver of Jury Trial.** SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

**Section 10.14. Independent Consideration**. Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100 as independent and non-refundable Agreement consideration ("**Independent Consideration**") for any options granted in this Agreement, provided that the option is subject to Bankruptcy Court approval. This Independent Consideration is in addition to any other deposits made under this Agreement, is earned by Seller upon its execution of this Agreement, and will not be credited against the Purchase Price.

**Section 10.15. Stalking Horse Bidder Consideration**. Notwithstanding anything else herein to the contrary, if the Purchaser elects to terminate this Agreement before the Bid Deadline for any reason other than pursuant to the terms of Article VII of this Agreement, then ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) of the Escrow Deposit will not be refunded to the Purchaser and instead shall be paid to the Seller as additional Independent Consideration. The terms of this Section 10.15 only apply to Texas Health Resources (or its assignee) as the stalking horse purchaser under the Bid Procedures and not to any other Qualified Bidder.

**Section 10.16. Effective Date.** As used herein, the "**Effective Date**" of this Agreement or "date" of this Agreement shall in each case mean and be deemed to be the date the Title Company acknowledges receipt of a fully executed Agreement.

**Section 10.17. Authorship.** Each of the Parties has actively participated in the negotiation and drafting of this Agreement and the Closing Documents and each has received independent legal advice from attorneys of its choice with respect to the advisability of making and executing this Agreement and the Closing Documents. In the event of any dispute or controversy regarding this Agreement or any of the Closing Documents, the Parties will be conclusively deemed to be the joint authors of this Agreement and the Closing Documents and no provision of this Agreement or the Closing Documents will be interpreted against a party by reason of authorship.

**Section 10.18. Dispute.** In the event of any dispute between the Parties regarding any of the transactions contemplated by this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees on an hourly basis and not as a percentage of the debt, actually incurred by the prevailing party in connection with such dispute, with any right to have the amount of "reasonable" attorneys' fees determined by the Bankruptcy Court in accordance with any applicable laws of the State of Texas.

**Section 10.19. Reporting Person**. Seller and Purchaser hereby designate Title Company to act as and perform the duties and obligations of the "reporting person" with respect to the transaction contemplated by this Agreement for purposes of 26 C.F.R. Section 1.6045 4(e)(5) relating to the requirements for information reporting on real estate transactions closed on or after January 1, 1991. In this regard, Seller and Purchaser each agree to execute at Closing, and to cause Escrow Agent to execute at Closing, a designation agreement designating Title Company as the reporting person with respect to the transaction contemplated by this Agreement.

**Section 10.20. Merger; No Representations; Entire Agreement.** This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and supersedes any other prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement is entered into after full investigation, no party relying upon any statement or representation, not set forth in this Agreement, made by any other party.

**[SIGNATURE PAGE FOLLOWS]**

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PURCHASER

**TEXAS HEALTH RESOURCES,**
a Texas non-profit corporation


By: _____
Name:
Title:


SELLER

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership


By:    NEAL RICHARDS GROUP FOREST PARK
       DEVELOPMENT LLC,
       its General Partner

       By: _____
           Todd Furniss
           Manager


ACKNOWLEDGED RECEIPT OF EXECUTED AGREEMENT:

DATED: _____ ___, 2016

**REPUBLIC TITLE OF TEXAS, INC.**


By: _____
Name: Chase Evans
Title:   Escrow Officer

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PURCHASER

**TEXAS HEALTH RESOURCES**,
a Texas non-profit corporation

By: _____
Name: Barclay E. Berdan
Title:   Chief Executive Officer

SELLER

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:     NEAL RICHARDS GROUP FOREST PARK
        DEVELOPMENT LLC,
        its General Partner

        By: _____
            Todd Furniss
            Manager

ACKNOWLEDGED RECEIPT OF EXECUTED AGREEMENT:

DATED: _____ ___, 2016

**REPUBLIC TITLE OF TEXAS, INC.**

By: _____
Name: Chase Evans
Title:   Escrow Officer

EXECUTION VERSION

LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT A | LAND |
| EXHIBIT B-1 | LIST OF MOB LEASES |
| EXHIBIT B-2 | LIST OF ADDITIONAL ASSIGNED CONTRACTS AND LEASES |
| EXHIBIT C | ADDITIONAL EXCLUDED PERSONAL PROPERTY |
| EXHIBIT D | FORM OF SPECIAL WARRANTY DEED |
| EXHIBIT E | FORM OF BILL OF SALE |
| EXHIBIT F | FORM OF ASSIGNMENT OF LEASES AND CONTACTS |
| EXHIBIT G | FORM OF FIRPTA AFFIDAVIT |
| EXHIBIT H | FORM OF TENANT NOTICE LETTER |
| EXHIBIT I | FORM OF TENANT ESTOPPEL CERTIFICATE |
| EXHIBIT J | FORM OF ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS |
| EXHIBIT K | FORM OF OWNER'S AFFIDAVIT |
| EXHIBIT L | FORM OF CLEARFORK PROPERTY ASSOCIATION ESTOPPEL CERTIFICATE |
| EXHIBIT M | BID PROCEDURES ORDER |
| EXHIBIT N | SALE ORDER |
| EXHIBIT O | SALE PROCEDURES MOTION |

EXECUTION VERSION

**EXHIBIT A**
**LEGAL DESCRIPTION**

Lots lRl and 1R2, Block NW-1, EDWARDS RANCH, CLEARFORK ADDITION, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat thereof recorded in Instrument No. D214055743, Plat Records, Tarrant County, Texas.

EXECUTION VERSION

**EXHIBIT B-1**
**MOB LEASES**

Medical Office Lease Agreement, together with any amendments thereto (collectively, the "USMD Lease") entered into by and between the Seller and USMD PPM, LLC ("USMD") on or about March 9, 2015 for office space on the First, Second, Third and Fourth floors of the MOB owned by Seller located at 5450 Clearfork Main Street, Fort Worth, Texas 76109

Lease agreement entered into by and between Seller and Emergency Medicine Physicians of Collin County

Lease agreement entered into by and between Seller and One to One

EXECUTION VERSION

# EXHIBIT B-2
## ADDITIONAL ASSIGNED CONTRACTS AND LEASES

None.

EXECUTION VERSION

## EXHIBIT C
## ADDITIONAL EXCLUDED PROPERTY AND CONTRACTS

Service Contract with April Building Services, Inc.
Service contract with The Brandt Companies, LLC
Service contract with The Lee Quigley Company
Service contract with Waste Management
Service contract with Iliff & Associates, Inc.
Service contact with KONE, Inc.
Service contract with Landscape & Floral Group Interiors, Inc.
Service contract with MBA Pest Management
Service contract with Protection Systems
Property management agreement with Holt Lunsford Commercial, Inc.
Asset management agreement with Neal Richards Group, LLC

EXECUTION VERSION

**EXHIBIT D**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

THE STATE OF TEXAS          §
                           §          KNOWN ALL MEN BY THESE PRESENTS:
COUNTY OF TARRANT          §

FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership ("**Grantor**") and a debtor in the bankruptcy case styled I*n re FPMC Fort Worth Realty Partners LP* in the United States Bankruptcy Court for the Northern District of Texas, Case No. 15-44791 (the "**Bankruptcy Case**"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to the undersigned in hand paid by **[Purchaser]** ("**Grantee**"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, SOLD AND CONVEYED, and by these presents does GRANT, SELL AND CONVEY unto Grantee, the land in Tarrant County, Texas fully described on **Exhibit A** attached hereto (the "**Land**"), together with all buildings, structures, parking areas, sidewalks, landscaping and other improvements and fixtures located on the Land and all of Grantor's right, title, and interest in and to all related rights and appurtenances, including, without limitation, any and all right, title and interest of Grantor in and to (i) easements, adjacent streets, waterways, air rights, strips and gores, roads, alleys or rights of way open or proposed, and rights, titles and interests of Grantor in and to any reversionary rights, if any, attributable or appurtenant to the Land, (ii) any land lying in the bed of any street, alley, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, (iii) any award made or to be made with respect to a condemnation, eminent domain or other governmental acquisition proceedings applicable to the Land, and (iv) any unpaid award for damage to the Land by reason of change of grade of any street (collectively, the "**Improvements**" and such Land and Improvements being called collectively the "**Property**") pursuant to that certain Order Confirming Sale of Property [Docket No. _____] as attached hereto as **Exhibit B** (the "**Bankruptcy Order**").

This conveyance, however, is made and accepted subject to the matters described on **Exhibit C** attached hereto and made a part hereof (hereinafter referred to as the "**Permitted Encumbrances**").

EXECUTION VERSION

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee and Grantee's successors and assigns forever, subject to the Permitted Encumbrances. Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, Grantee's successors and assigns against every person whomsoever claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.

THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRANTOR HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY.

EXECUTED as of the ___ day of _____, 2016, to be effective upon delivery.

<strong><u>GRANTOR</u></strong>:

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK
DEVELOPMENT LLC,
its General Partner

By:    _____
Todd Furniss
Manager

THE STATE OF _____    §
§
COUNTY OF _____        §

    This instrument was acknowledged before me on the ___ day of _____, 2016, by _____, _____ of Neal Richards Group Forest Park Development LLC, a _____, the general partner of FPMC Fort Worth Realty Partners, LP, a Texas limited partnership on behalf of said limited partnership.

_____
Notary Public in and for the State of _____

GRANTEE'S ADDRESS FOR TAX NOTICES &
WHEN RECORDED RETURN TO:

_____
_____
_____

EXHIBIT A

LAND

[INSERT]

EXHIBIT B

BANKRUPTCY ORDER

[INSERT]

EXECUTION VERSION

EXHIBIT C

PERMITTED ENCUMBRANCES

[INSERT]

**EXHIBIT E**

**FORM OF BILL OF SALE**

This Bill of Sale (this "**Bill of Sale**") is made as of _____, 2016, by FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership ("**Grantor**") and a debtor in the bankruptcy case styled *In re FPMC Fort Worth Realty Partners LP* in the United States Bankruptcy Court for the Northern District of Texas, Case No. 15-44791 (the **Bankruptcy Case**") to **[Purchaser]** ("**Grantee**"). Unless otherwise defined in this Bill of Sale, all capitalized terms used herein shall have the meaning given to them in that certain Purchase and Sale Agreement by and between Grantor and Grantee (the "**Contract**").

For and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to Grantor paid by the Grantee, the receipt and sufficiency of which are acknowledged, Grantor GRANTS, SELLS, and CONVEYS to Grantee, all equipment, furniture, fittings, fixtures, and articles of personal property owned by Grantor and either located on or used exclusively in connection with the real property described on **Exhibit A** attached to this Bill of Sale (such equipment, furniture, fittings, fixtures, and articles of personal property are referred to collectively as the "**Personal Property**") more particularly described on **Exhibit B** attached hereto and made a part hereof pursuant to that certain Order Confirming Sale of Property [Docket No. _____] as attached hereto as **Exhibit C** (the "**Bankruptcy Order**"). It is expressly agreed, however, that the Personal Property shall not include the Excluded Personal Property as defined in the Contract.

EXCEPT AS EXPRESSLY SET FORTH IN THE CONTRACT TO WHICH THIS BILL OF SALE RELATES, THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRANTOR HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY. THE CONVEYANCE IS MADE WITHOUT RECOURSE AGAINST GRANTOR.

**[Signature page follows]**

EXECUTED to be effective as of the date first written above.

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership


By:   NEAL RICHARDS GROUP FOREST PARK
      DEVELOPMENT LLC,
      its General Partner


      By:   _____
            Todd Furniss
            Manager

EXECUTION VERSION

<u>Exhibit A</u>

Real Property Description

[INSERT]

<u>Exhibit B</u>

Personal Property Description

[INSERT]

EXECUTION VERSION

<u>Exhibit C</u>

Bankruptcy Order

[INSERT]

**EXHBIT F**

**FORM OF ASSIGNMENT OF LEASES AND CONTRACTS**

This ASSIGNMENT OF LEASES AND CONTRACTS (this "**Assignment**") is made as of _____, 2016 (the "**Effective Date**"), by FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership (**"Assignor"**) and a debtor in the bankruptcy case styled *In re FPMC Fort Worth Realty Partners LP* in the United States Bankruptcy Court for the Northern District of Texas, Case No. 15-44791 (the "**Bankruptcy Case**"), and **[PURCHASER]** ("**Assignee**").

Recitals:

A.     Pursuant to the Purchase and Sale Agreement dated as of _____, 2016 by and between Assignor and Assignee (the "**Purchase Agreement**"), Assignor is conveying to Assignee certain real property, together with all structures and other improvements located thereon and thereunder, located in Tarrant County, Texas as described on **Exhibit A** of the Purchase Agreement and by this reference incorporated herein (the "**Property**"). Capitalized terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

B.     This Assignment is being entered into pursuant to the Purchase Agreement, upon the closing thereunder, in order to effect the assignment and assumption of Assignor's interest under the leases set forth on **Schedule A** attached to this Assignment (collectively, the "**Leases**"), including any related guaranties to such Leases as set forth on **Schedule B** attached to this Assignment (collectively the "**Guaranties**") and the contracts for service, repair, supply, utility, equipment and maintenance of the Property set forth on **Schedule C** attached to this Assignment (the "**Service Contracts**"), pursuant to that certain Order Confirming Sale of Property [Docket No. _____] as attached hereto as **Exhibit 1** (the "**Bankruptcy Order**") entered in the Bankruptcy Case.

**NOW, THEREFORE, FOR VALUE RECEIVED**, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignment.     Assignor hereby ASSIGNS, GRANTS, DELIVERS and CONVEYS to Assignee all of Assignor's rights, interests and obligations in (i) the Leases, including without limitation all rents, guaranties, and security deposits (to the extent not forfeited by, credited or returned to, tenants) thereunder (subject to adjustment as set forth in the Purchase Agreement) and (ii) the Service Contracts.

2.     Assumption.     Assignee hereby (i) accepts the assignment of the Leases and the Service Contracts, and (ii) assumes those obligations of the Assignor under the Leases and the Service Contracts that first arise or accrue from and after the date hereof including, without limitation, the obligation to return security deposits (to the extent not forfeited by, credited or returned to, tenants) thereunder.

3.     Indemnification. Assignor hereby agrees to indemnify Assignee from and against any and all actual losses incurred by Assignee arising from claims brought against Assignee, as

successor to the interest of Assignor under the Leases and the Service Contracts, relating to the breach by Assignor of any of the obligations under the Leases or the Service Contracts which accrued prior to the date hereof.  Each party's rights and obligations under this Section 3 shall be limited by, and terminate in accordance with the terms of the Purchase Agreement.

4.     <u>Binding Effect</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.     <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

**[SIGNATURE PAGES FOLLOW]**

DATED EFFECTIVE as of the first date above written.

**GRANTOR:**

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK
          DEVELOPMENT LLC,
          its General Partner


By:    _____
          Todd Furniss, Manager

DATED EFFECTIVE as of the first date above written.

**[PURCHASER]**

By: _____

Name:

Title:

## SCHEDULE A

LEASES

[INSERT]

EXECUTION VERSION

## SCHEDULE B

GUARANTIES

[INSERT]

EXECUTION VERSION

## SCHEDULE C

SERVICE CONTRACTS

[INSERT]

<u>EXHIBIT 1</u>

BANKRUPTCY ORDER

[INSERT]

**EXHIBIT G**

**FORM OF NON-FOREIGN CERTIFICATE**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **FPMC Fort Worth Realty Partners, LP**, a Texas limited partnership ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor.

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is _____; and

4.      Transferor's office address is:      2101 Cedar Springs Road, Suite 1540
                                              Dallas, Texas 75219

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my Knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK
       DEVELOPMENT LLC,
       its General Partner

By:    _____
       Todd Furniss
       Manager

STATE OF _____          §
                                 §
COUNTY OF _____           §

     This instrument was acknowledged before me on _____, 20__, by _____, _____ of _____, a _____, on behalf of said _____.

_____
Notary Public, State of
_____

     SWORN TO AND SUBSCRIBED BEFORE ME by _____ on _____, 20____.

Notary Public, State of _____

EXECUTION VERSION

# EXHIBIT H

## FORM OF TENANT NOTICE LETTER
[Date]

[Project Name]
[Address]
[City/State/ZIP]

Dear Tenant:

Notice is hereby given to the tenants of _____ (the "**Property**") that Fort Worth Realty Partners, LP, a Texas limited partnership ("**Seller**"), the current owner of the Property, has sold the Property to **[Purchaser]** ("**Buyer**") effective **[date of takeover]**.  Buyer has assumed all of the obligations of landlord under your lease, including any obligations with respect to your security deposit, if any, which has been transferred to Buyer.

Rental payments to the Buyer shall be delivered to the following address:

_____
_____
_____

Tenant inquiries shall be directed to:

_____
_____
_____

Sincerely,

"SELLER"

_____
_____
_____

"BUYER"

_____
_____
_____

## EXHIBIT I

## FORM OF TENANT ESTOPPEL CERTIFICATE

The undersigned ("**Tenant**") hereby certifies to FPMC Fort Worth Realty Partners, LP, a Texas limited partnership ("**Landlord**"), and **[Purchaser]**, and its lenders, successors and assigns (collectively, "**Buyer**"), as of the date of this estoppel certificate ("**Estoppel Certificate**") the following:

A.  Tenant is the lessee under that certain lease dated _____ relating to approximately _____ square feet located at _____ (the "**Premises**") at _____ (the "**Property**"), together with any amendments hereto (collectively, the "**Lease**").

B.  The dates of all amendments to the Lease are as follows:

C.  There are no other agreements, oral or in writing, between Landlord and Tenant with respect to the Premises excepted as identified above.

D.  The Lease is in full force and effect, and Tenant has accepted and is in possession of the Premises, except: _____.

E.  To Tenant's actual Knowledge, no default exists under the Lease by Landlord or by Tenant.  "Knowledge" means any matters known by or which should be known following reasonable inquiry.

F.  To Tenant's actual Knowledge, Tenant has no claim or demand against the Landlord and no claims, defenses or offsets against rental due or to become due under the Lease. Tenant has no right to any concession (rental or otherwise) or similar compensation pertaining to the Lease or Premises.

G.  Monthly base rent is equal to $_____ and has been paid through _____, 20__.  No rent has been or will be paid more than one (1) month in advance of its due date, except: _____.

H.  Tenant's security deposit held by Landlord is $_____ [in cash] [in the form of a letter-of-credit].

I.  Tenant has no right or option to purchase any portion of the real property upon which the Premises are situated.

J.  Tenant has not assigned any of its rights under the Lease or sublet all or any portion of the Premises, except as follows: _____.

K.  To Tenant's actual Knowledge, all work to be performed to the Premises for Tenant under the Lease has been performed in all material respects, except as follows: _____.

L.     To Tenant's actual Knowledge, all payments, free rent, or other credits, allowances or abatements required to be given under the Lease to Tenant with respect to work to be performed to the Premises have been received by Tenant, except _____.

M.     Neither the Lease nor any other agreement confers upon Tenant any: (i) option or right to extend the term of the Lease; (ii) right to acquire additional space; or (iii) right to terminate the Lease (apart from any termination right arising out of damage to or condemnation of the Premises) unless and except as described herein:_____.

Tenant acknowledges that this Estoppel Certificate is being given in order to induce Buyer to purchase the property of which the Premises are a part, and to take on the obligations of Landlord.  Buyer is entitled to rely upon this Estoppel Certificate.

Dated:_____, 2016.

TENANT:

_____

By: _____

Name: _____

Title: _____

**EXHIBIT J**

**ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS**

This ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS (this "**Assignment**") is dated as of _____, 2016 (the "**Effective Date**"), by and between FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership ("**Assignor**"), and **[Purchaser]** ("**Assignee**").

<u>Recitals:</u>

A.      Pursuant to the Purchase and Sale Agreement dated as of _____, 2016 by and between Assignor and Assignee (the "**Purchase Agreement**"), Assignor is conveying to Assignee certain real property, together with all structures and other improvements located thereon and thereunder, located in Tarrant County, Texas as described on **<u>Exhibit A</u>** of the Purchase Agreement and by this reference incorporated herein (the "**Property**"). Capitalized terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

B.      In connection with the above conveyance, Assignor is to assign, transfer and convey to Assignee to the extent assignable or transferable, all of Assignor's right, title and interest in and to all (i) construction warranties and construction guaranties issued with respect to the improvements on the Property that are capable of being assigned to Assignee (collectively, the "**Construction Warranties**"), and (ii) licenses, permits or similar documents to the improvements on the Property that are capable of being assigned to Assignee (collectively, the "**Licenses and Permits**" and together with the Construction Warranties, the "**Intangible Property**").

**NOW, THEREFORE, FOR VALUE RECEIVED**, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      <u>Assignment</u>.  Assignor hereby grants, transfers, assigns, delivers and conveys to Assignee, without any representation or warranty (whether express or implied), as of the Effective Date, all of Assignor's right, title and interest in and to the **Intangible Property**. Except as expressly set forth in the Purchase Agreement, the Intangible Property is sold and conveyed, AS IS, WHERE IS, AND WITH ALL FAULTS, and without recourse against Assignor.  Assignor remains responsible for all liabilities and obligations of Assignor relating to the Intangible Property which accrue prior to the Effective Date.

2.      <u>Assumption</u>.  Assignee hereby assumes, and agrees to be bound by, all obligations and liabilities of Assignor under or relating to the Intangible Property which shall arise or be incurred, or which are required to be performed, on and after the Effective Date.

3. <u>Binding Effect</u>.  This Assignment shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

4. <u>Applicable Law</u>.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of Texas.

5. <u>Recitals</u>.  The recitals are herein incorporated into this Assignment.

6. <u>Counterparts</u>.  This Assignment may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

**[Signatures appear on the following page]**

EXECUTION VERSION

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the Effective Date.

ASSIGNOR:

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:  NEAL RICHARDS GROUP FOREST
     PARK DEVELOPMENT LLC,
     its General Partner

        By:  _____
             Todd Furniss, Manager

ASSIGNEE:

**[PURCHASER]**

By:  _____
Name:
Title:

## EXHIBIT K

### FORM OF OWNER'S AFFIDAVIT

TITLE ORDER:
ESCROW ORDER:
PROPERTY:
COUNTY:
STATE:

FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership (collectively, "**Seller**"), as seller, and **[Purchaser]** ("**Buyer**"), as buyer, are parties to that certain Purchase and Sale Agreement (the "**Purchase Agreement**") dated _____, 2016, as the same has been amended and modified, relating to the improved real property (the "**Real Property**") referred to in **Exhibit A** attached hereto and made a part hereof.

In connection with the consummation of the transactions contemplated by the Purchase Agreement, Seller hereby represents and warrants to [Title Company] the following:

1.      Each party comprising Seller has consented to the sale of the Real Property as provided in the Purchase Agreement and has authorized Todd Furniss as Manager of the Neal Richards Group Forest Park Development LLC, the Seller's General Partner, as its agent and attorney in fact, to execute any and all closing documents on its behalf.

2.      To Seller's Knowledge, the leases described on **Exhibit B** attached hereto constitute all of the written leases affecting the Real Property with the current tenants of the Real Property.

3.      To Seller's Knowledge, except as disclosed in **Exhibit C** attached hereto and made a part hereof, (a) there is no capital improvement work currently being constructed (or that was constructed during the last 3 months) on the Real Property that is the subject of a written contract with Seller which could give rise to a mechanic's or materialman's lien on the Real Property, and (b) Seller has not entered into any contracts for the furnishing of labor, materials, or services for construction purposes with respect to the Real Property to be furnished subsequent to the date of this affidavit.

4.      Seller shall not hereafter cause any encumbrances or other instruments to be recorded against the Property (other than the recording of a special warranty deed (the "**Deed**") transferring fee title to the Real Property to Buyer) through the date the Deed is recorded in Tarrant County, Texas.

For purposes hereof, "Knowledge" means any matters known by Todd Furniss.

Notwithstanding anything contained herein to the contrary, the representations and warranties set forth in this Owner's Affidavit shall only survive the closing of the transactions as provided in the Purchase Agreement, after which date this Owner's Affidavit shall be of no further force or effect and Buyer shall have no further rights hereunder (notwithstanding that one or more of the

representations and/or warranties set forth herein may prove to be incorrect). This Owner's Affidavit is being executed for the sole and exclusive benefit of Buyer and no other party or person shall have any rights hereunder.

[SIGNATURES ON NEXT PAGE]

Executed as of _____, 2016

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK
       DEVELOPMENT LLC,
       its General Partner


       By:   _____
           Todd Furniss
           Manager

<u>EXHIBIT A</u>

REAL PROPERTY

[INSERT]

<u>EXHIBIT B</u>

RENT ROLL

[INSERT]

EXECUTION VERSION

EXHIBIT C

[INSERT]

**EXHIBIT L**

**CONSENT AND ESTOPPEL CERTIFICATE**
(Edwards Ranch Clearfork Addition)

The undersigned, **CLEARFORK RANCH, L.P.,** a Texas limited partnership ("Declarant") make this estoppel certificate on this _____ day of _____, 2016, for the benefit of **[Purchaser]** ("Purchaser") any current or future mortgagee of Purchaser in connection with the Property.

Reference is made to that certain Declaration of Covenants, Conditions and Restrictions for Edwards Ranch Clearfork Addition recorded as Instrument #D208439441 in Tarrant County Real Property Records, as amended by the First Amendment to the Declaration of Covenants, Conditions and Restrictions for Edwards Ranch Clearfork Addition recorded as Instrument #D210177329 in the Tarrant County Real Property Records (collectively, the "Declaration"). Certain restrictions, covenants and obligations contained in the Declaration encumber that certain real property more particularly described in Exhibit A attached hereto (the "Property"). Capitalized terms used herein and not defined shall have the meanings set forth in the Declaration.

Purchaser intends to purchase the Property from FPMC Fort Worth Realty Partners, LP, a Texas limited partnership ("Seller"). In connection with such transaction, Declarant hereby certifies as follows:

1.      Declarant is the current "Declarant" under the Declaration, and Declarant has not assigned any of its rights under the Declaration to any party.

2.      The Declaration (i) is in full force and effect, (ii) is binding against the Property, and (iii) has not been amended or modified in any respect.

3.      All assessments and all other payments and sums due pursuant to the terms of the Declaration (collectively, "Assessments") relating to the Property have been paid to date and are current and there are no defaults related to the payment of such Assessments affecting the Property[, except for the following _____].

4.      To the actual knowledge of the undersigned, there are no (i) defaults under or violations of the Declaration on the part of Declarant or Seller, or (ii) circumstances existing as of the date hereof that, with the passage of time, the giving of notice, or both, would constitute a default or violation thereunder by Declarant or Seller[, except for the following _____].

5.      The Property (including, without limitation, the development, use and operation thereof) is currently in full compliance with the terms, covenants, conditions and requirements set forth in the Declaration and there is no violation of any provisions therein[, except for the following _____].

6.    Medical Waste Materials.    Section 6.5 of the Declaration prohibits (with certain exclusions) the storage, discharge or disposal of hazardous, toxic or regulated materials or substances on the Property.   Declarant agree that in connection with its operation of a surgery specialty hospital on the Property, Purchaser will have the right to store and use medical waste typically generated in hospitals similar to the specialty hospital operating on the Property that is regulated by environmental laws, so long as such medical waste is stored, used, discharged and disposed of in compliance with all applicable laws, rules and regulations.   Purchaser agrees to indemnity Declarant from and against any and all damages, costs, claims or liabilities relating to or resulting from the storage, use, discharge or disposal or any such medical waste.

This estoppel certificate may be relied upon by Purchaser and any current or future mortgagee of Purchaser in connection with the Property.

**DECLARANT**:

**CLEARFORK RANCH, L.P.**,
a Texas limited partnership

By: Cassco Development Co., Inc., a Texas Corporation, its General Partner

By:   _____
Name:   _____
Title:   _____

**PURCHASER**:

**[PURCHASER]**

By:   _____
Name:   _____
Title:   _____

## Exhibit A

DESCRIPTION OF PROPERTY

[INSERT]

# EXHIBIT M

BID PROCEDURES ORDER

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FPMC FORT WORTH REALTY** | § | **CASE NO. 15-44791-MXM-11** |
| **PARTNERS, LP,** | § | |
| | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

**ORDER APPROVING (A) BID PROCEDURES, (B) SALE NOTICE, (C) ASSUMPTION**
**AND ASSIGNMENT PROCEDURES, AND (D) SCHEDULING**
**OBJECTION DEADLINES, AUCTION AND SALE HEARING**

Upon consideration of the motion (the "Motion")[1] [Dkt. No. __] filed by FPMC Fort

Worth Realty Partners, LP (the "Debtor") seeking entry of an order authorizing and approving,

among other things, (a) the bid procedures for the sale of the Property (the "Sale"); (b) the form

and manner of notice (the "Sale Notice") of the Sale; (c) the form and manner of notice of the

assumption and assignment, including cure amounts, of executory contracts and unexpired

leases; (d) approval of Texas Health Resources (the "Stalking Horse Bidder") as the stalking

horse bidder under the terms of that certain Asset Purchase Agreement dated as of April 20,

2016 (the "Purchase Agreement") between the Debtor and the Stalking Horse Bidder; and

(e) scheduling objection deadlines, auction and a final hearing to approve the sale of the Property

---

[1]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the
Motion, the Purchase Agreement, or the Bid Procedures as applicable.

(the "Sale Hearing"); and the Court having reviewed the Motion; and this Court having determined that the relief requested is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, including for the reasons stated on the record at the hearing seeking approval of the relief herein:

IT HEREBY ORDERED, ADJUDGED AND DECREED THAT:[2]

A.      The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

B.      The statutory and legal predicates for the relief requested in the Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.      Notice of the Motion has been given to all creditors, equity holders, the United States Trustee for the Northern District of Texas, and all parties that have requested notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  Considering the circumstances and the nature of the relief requested, good and sufficient notice of the relief granted by this Order has been given and no further notice is required.

D.      The bid procedures in the form attached hereto as Exhibit 1 (the "Bid Procedures") are fair, reasonable and appropriate, and are designed to maximize recovery with respect to the Sale.

---

[2]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* FED. R. BANKR. P. 7052.

E.       The Debtor's proposed notice of the Sale substantially in the form attached hereto as <u>Exhibit 2</u> (the "<u>Sale Notice</u>") is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of, as applicable, the Bid Procedures, the deadline for filing objections to the Sale and entry of the Sale Order, the deadline for submitting competing bids for the Property, and the date, time, and place of the Auction (defined below) and the Sale Hearing, and no other or further notice is required.

F.       The Assumption and Assignment Procedures (defined below) set forth herein, and the assumption and assignment notice substantially in the form attached as <u>Exhibit 3</u> (the "<u>Assumption and Assignment Notice</u>"), are reasonably calculated to provide contract counterparties (the "<u>Contract Counterparties</u>") to any of the Debtor's contracts and/or leases that may be assumed by the Debtor and assigned (the "<u>Assigned Contracts</u>") to the Successful Bidder (defined below) with proper notice of the intended assumption and assignment of their contracts and/or leases, the procedures in connection therewith, and any Cure Amounts (defined below) relating thereto.

G.       Entry of this Order is in the best interests of the Debtor and its estate, creditors, and interest holders and all other parties in interest herein.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.       The Motion is GRANTED as set forth herein.

2.       All objections to the Motion, as they pertain to the entry of this Order, are overruled to the extent they have not been withdrawn, waived or otherwise resolved.

## **Bid Procedures**

3.       The Bid Procedures, attached hereto as Exhibit 1, are hereby authorized, approved and made part of this Order as if fully set forth herein.  The Bid Procedures shall govern the

submission, receipt, and analysis of all Bids relating to the proposed Sale of the Property. Any party desiring to bid on the Property shall comply with the Bid Procedures and this Order. The Debtor is authorized to take any and all actions necessary to implement the Bid Procedures.

4.      For the purposes of the Bid Procedures: (i) the Stalking Horse Bidder is deemed to be a Qualified Bidder and the Purchase Agreement is deemed to be a Qualified Bid.

5.      If the Debtor does not receive at least one Qualified Bid by the Bid Deadline (other than the bid by the Stalking Horse Bidder), the Debtor will not conduct the Auction and the Debtor shall promptly proceed to seek entry of the appropriate order approving the Purchase Agreement.

6.      In the event that the Debtor timely receives one or more Qualified Bids (other than from the Stalking Horse Bidder), then the Debtor will conduct the Auction with respect to the Property in accordance with the Bid Procedures.

7.      Subject to the final determination of this Court, the Debtor is authorized to determine, in its business judgment and pursuant to the Bid Procedures, the highest or best bid (the "Successful Bid" and the party submitting such highest or best bid being the "Successful Bidder").

8.      In the event there are more than one Qualified Bidder, an auction (the "Auction") will be held at 9:30 a.m. (CST) on May 12, 2016 (the "Auction Date"). The Auction will be conducted at the offices of Franklin Hayward LLP at 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231. Only the Debtor and its representatives, any Qualified Bidders who have submitted Qualified Bids, and their respective professionals shall be permitted to attend the Auction, and only Qualified Bidders who have submitted Qualified Bids shall be eligible to participate in (i.e., bid at) the Auction.

<u>**Assumption and Assignment Procedures**</u>

9.      The following procedures regarding the assumption and assignment of the Assigned Contracts in connection with the Sale (the "<u>Assumption and Assignment Procedures</u>") are hereby approved to the extent set forth herein, and shall govern the assumption and assignment of the Assigned Contracts

10.      As soon as practicable after entry of this Order, the Debtor shall serve on all Contract Counterparties an Assumption and Assignment Notice substantially in the form attached hereto as <u>Exhibit 3</u>, that identifies, to the extent applicable, (i) the Assigned Contract(s) with such Contract Counterparty; (ii) the name and address of the Contract Counterparty thereto; (iii) notice of the proposed effective date of the assignment (subject to the right of the Debtor (in consultation with the Stalking Horse Bidder) to withdraw such request for assumption and assignment of the Assigned Contracts prior to the closing of the Sale); (iv) the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default under such Assigned Contract(s) in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "<u>Cure Amount</u>"); (v) the deadlines by when such Contract Counterparty must file an objection to the proposed assumption and assignment of such Assigned Contract(s); provided, however, that the presence of any contract or lease on an Assumption and Assignment Notice does not constitute an admission that such contract or lease is an executory contract or an unexpired lease.  The original Assumption and Assignment Notice will (i) identify the Stalking Horse Bidder, and (i) contain a statement as to the Stalking Horse Bidder's ability to perform the Debtor's obligations under the applicable Assigned Contracts.

11.      All objections to the assumption and assignment of any Assigned Contract, including, without limitation, any objection to the Debtor's proposed Cure Amount or the

provision of adequate assurance of future performance under any Assigned Contract pursuant to Section 365 of the Bankruptcy Code ("Adequate Assurance") must: (a) comply with the general objection procedures set forth herein; (b) identify the specific Assigned Contract(s) to which the objector is party; (c) describe with particularity any cure the objecting party contends is required under Section 365 of the Bankruptcy Code (the "Cure Claim") and identify the basis(es) of the alleged Cure Claim under the Assigned Contract(s); (d) attach all documents supporting or evidencing the Cure Claim; and (e) if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance (collectively with the general objection procedures, the "Assigned Contract Objection Procedures").

12.     If no objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, (a) the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling notwithstanding anything to the contrary in the Assigned Contract or any other document and the Contract Counterparty thereto shall be forever barred from asserting any other claim against the Debtor or the Successful Bidder with respect to such Assigned Contract arising prior to the assignment thereof, and (b) the Successful Bidder's promise to perform under the Assigned Contract shall be deemed Adequate Assurance thereunder. To the extent the Debtor disputes any Cure Claim, such dispute shall be presented to the Court at the Sale Hearing, or such later date and time as the Debtor and the objector may agree or the Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of any Assigned Contract.

13.     If at any time after the entry of this Order the Debtor identifies additional prepetition executory contracts and/or unexpired leases to be assumed and assigned to the

Successful Bidder as Assigned Contracts, the Debtor shall serve a supplemental Assumption and Assignment Notice by facsimile, electronic transmission, hand delivery or overnight mail on the Contract Counterparty (and its attorney, if known) to each supplemental Assigned Contract at the last known address available to the Debtor by no later than five (5) calendar days before the Objection Deadline (defined below). A Contract Counterparty receiving any such supplemental Assumption and Assignment Notice shall have until the Objection Deadline to file an objection to the assumption and assignment of its Assigned Contract(s) in accordance with the Assigned Contract Objection Procedures set forth herein.

14.     If the Debtor selects a Successful Bid from an entity other than the Stalking Horse Bidder at the Auction, then the Debtor shall serve a supplemental Assumption and Assignment Notice by facsimile, electronic transmission, hand delivery or overnight mail on the Contract Counterparties (and their attorneys, if known) to each Assigned Contract at the last known address available to the Debtor by no later than three (3) calendar days before the Objection Deadline that (a) identifies the Successful Bidder; and (b) contains a statement as to the Successful Bidder's ability to perform the Debtor's obligations under the applicable Assigned Contracts. A Contract Counterparty receiving any such supplemental Assumption and Assignment Notice shall have until the Objection Deadline to file an objection to the assumption and assignment of its Assigned Contract in accordance with the Assigned Contract Objection Procedures set forth herein.

## Sale Notice

15.     The Sale Notice is hereby approved. On or within three (3) business days following the entry of this Order, the Debtor shall cause the Sale Notice, together with copies of this Order and the Bid Procedures, to be served on (i) all entities known by the Debtor to have

expressed an interest in entering into a transaction involving the Property within the last six (6) months, (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all non-debtor parties to relevant contracts or leases (executory or otherwise); (iv) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Property; (vi) the United States Trustee for the Northern District of Texas; (vii) the 20 largest unsecured creditors of the Debtor; and (viii) all parties that have requested notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.

## **Objection Procedure**

16.     The Sale Notice shall state that any party in interest objecting to the entry of the proposed Order approving the Sale shall file written objections with the Clerk of the Bankruptcy Court and serve such objections on the following parties: (a) counsel to the Debtor: Franklin Hayward LLP, 10501 N. Central Expy., Ste. 106, Dallas, Texas  75231 Attn: Melissa S. Hayward; (b) the U.S. Trustee, in each case to allow actual receipt of the foregoing no later than May  17, 2016, at 4:00 p.m. (CT) (the "Objection Deadline").

17.     Any party that seeks to object to the relief requested in the Motion pertaining to approval of the Sale and the transactions contemplated by the Sale Motion shall file a formal written objection that complies with the objection procedures as set forth herein and comply with the Bankruptcy Rules and the Local Rules

## **Sale Hearing**

18.     The hearing to consider approval of the Sale is scheduled on May 19, 2016 at 2:30 p.m. (CT) (the "Sale Hearing") in front of the Honorable Mark X. Mullin, United States Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of Texas,

Fort Worth Division, 501 West Tenth Street, Fort Worth, Texas 76102. If no objections to the relief sought in the Sale Hearing are filed and served in accordance with this Order, no Sale Hearing may be held, and a separate Order may be presented by the Debtor and entered by this Court approving the Sale.

### **Miscellaneous**

19.     The Debtor is authorized to take all actions necessary and appropriate to implement and effectuate the relief granted pursuant to this Order.

20.     Any stay of this Order, whether arising from Bankruptcy Rules 6004 and/or 6006 or otherwise, is hereby expressly waived and the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

21.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# **EXHIBIT 1**

Bid Procedures

**BID PROCEDURES**

A. <u>Background</u>. FPMC Fort Worth Realty Partners, LP (the "<u>Debtor</u>") is a debtor in a chapter 11 case (Case No. 15-44791-MXM-11) pending in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"). The Debtor is a party to that certain Asset Purchase Agreement dated as of April 20, 2016 (the "<u>Purchase Agreement</u>") between the Debtor, as seller, and Texas Health Resources (the "<u>Stalking Horse Bidder</u>"), as buyer, which agreement is subject to approval by the Bankruptcy Court and subject to higher and better competing bids from Qualified Bidders (defined below) for a sale transaction involving the Property (defined below) in accordance with the Bid Procedures Order (defined below) (each, an "<u>Alternative Transaction</u>").

B. <u>Assets to be Sold</u>. The assets to be sold consist of the real estate comprising the Forest Park Medical Center of Fort Worth, which includes, among other things, a hospital building, a medical office building, and a parking garage in addition to certain executory contracts and unexpired leases to which the Debtor is a party (collectively, the "<u>Property</u>"). Except for the Permitted Exceptions and the Assumed Liabilities (as such terms are defined in the Purchase Agreement), the Property will be sold free and clear of all liens, claims, interests, and encumbrances to the fullest extent allowed under § 363(f) of the Bankruptcy Code. The Property is being sold on an AS-IS, WHERE-IS basis.

C. <u>Bid Procedures Order</u>. In accordance with the Order (the "<u>Bid Procedures Order</u>") dated April 22, 2016, the Bankruptcy Court established the manner in which prospective bidders become Qualified Bidders (defined below), the submission of Qualified Bids (defined below), the conduct of any subsequent Auction (defined below) and the Bankruptcy Court's approval of the Successful Bid (defined below). Please note that all capitalized terms used but not defined herein have the meanings assigned to such terms in Bid Procedures Order.

D. <u>Qualified Bidder</u>. Each person or entity wishing to participate in the bid process must be a qualified bidder (a "<u>Qualified Bidder</u>"). In order for any third party to be a Qualified Bidder, it must, by no later than five business days after entry of the Bid Procedures Order, or at a time otherwise permitted by the Debtor:

  (i)  execute a confidentiality agreement containing terms that the Debtor deems appropriate in its sole discretion;

  (ii)  submit to the Debtor its most recent audited financial statements, current audited financial statements of its owners, or such other financial information, as the Debtor may reasonably determine, demonstrates the financial capability of the party to consummate the purchase of the Property within the timeframe set forth herein; and

  (iii)  make a deposit (the "<u>Qualified Bid Deposit</u>") in an amount equal to TWO MILLION TWO HUNDRED FORTY THOUSAND AND NO/100 DOLLARS ($2,240,000.00) made by cashier's check or by wire transfer of immediately available funds to an account designated by the Debtor. Wire transfer instructions may be obtained from the Debtor;

If the Debtor determines that a party has satisfied the foregoing, then the party is a "Qualified Bidder." Any disputes regarding whether a bidder is a "Qualified Bidder" shall be resolved by the Bankruptcy Court.

E.    Diligence, Inspection, Title Matters, and HSR Filings.

(i)    The Debtor shall provide the Qualified Bidders access to the Debtor's virtual data room in order to conduct due diligence regarding the Property.

(ii)   The Debtor shall allow Qualified Bidders to conduct inspections of the Property consistent with the terms in Section 3.07 of the Purchase Agreement, including that each Qualified Bidder agrees to indemnify the Debtor consistent with the terms of Section 3.07.

(iii)  The Debtor shall provide Qualified Bidders a copy of the Title Commitment and each Qualified Bidder must resolve any title objections prior to the Bid Deadline.

(iv)   All Qualified Bidders must complete their due diligence, inspections, title review and title objections and must make any appropriate filings pursuant to the HSR Act, in coordination with the Debtor, prior to the Auction. The Debtor will reimburse at Closing the filing fee paid by any Qualified Bidder with respect to such Qualified Bidder's filings pursuant to the HSR Act, not to exceed $45,000.00, to the extent that such Qualified Bidder timely submits a Bid Package (defined below) and is not the Successful Bidder.

F.    Qualified Bids. In order to constitute a "Qualified Bid," a Qualified Bidder must submit to the Debtor the following (the "Bid Package") by the Bid Deadline:

(i)    A purchase agreement (an "Alternate Purchase Agreement") in substantially the form of the Purchase Agreement for all or part of the Property for a purchase price of at least ONE HUNDRED TWELVE MILLION DOLLARS AND NO CENTS ($112,000,000) with terms not materially more burdensome to the Debtor than the Purchase Agreement or otherwise inconsistent with these Bid Procedures, which: (a) has been executed by a person with authority to irrevocably bind the bidder; (b) does not provide for the payment to the bidder of any break-up fee, topping fee, expense reimbursement or other similar arrangement; (c) is firm and unconditional and is not subject to any financing contingency, any contingency relating to the completion of unperformed due diligence, any contingency relating to the approval of the bidder's board of directors or other similar internal approvals or consents, any contingency relating to a material adverse change, or any other material conditions precedent to the bidder's obligation to close; (d) designates the executory contracts and unexpired leases as to which the bidder seeks assumption by the Debtor; provided that the Alternative Purchase Agreement must include the assumption and the assignment of the Hospital Operating Company Leases

and the MOB Leases; (e) is subject to acceptance by the Debtor solely by the Debtor's execution of the Alternate Purchase Agreement and approval of the Alternate Purchase Agreement by the Bankruptcy Court;

(ii) A document reflecting the differences between the Purchase Agreement and the Alternate Purchase Agreement which must be prepared with a document comparison/redlining software;

(iii) A bank account statement or other records that show the source of funds for the bidder's proposed purchase of the Property; and

(iv) A signed statement of the bidder (a) disclosing any formal or informal agreements or understandings reached by the bidder with parties in interest in the Bankruptcy Case in connection with the bid (or that no such agreements or understandings exist); (b) acknowledging that if chosen as the Successful Bidder (defined below), such bidder can consummate the purchase of the Property promptly upon approval of the Bankruptcy Court; and (c) agreeing that the bidder's offer in the Alternate Purchase Agreement is irrevocable until five (5) Business Days after the conclusion of the Auction.

(v) For the avoidance of doubt, the Stalking Horse Bidder is deemed to be a Qualified Bidder, and the Purchase Agreement is deemed to be a Qualified Bid, for all purposes in connection with the bid process and the Auction. The Debtor shall provide to the Stalking Horse Bidder a copy of all Alternate Purchase Agreements within one business day of the receipt of each Alternate Purchase Agreement by the Debtor.

G. Bid Deadline. All Bid Packages must be submitted to the Debtor at Melissa S. Hayward, Franklin Hayward LLP, 10501 N. Central Expressway, Ste. 106, Dallas, TX 75231], so as to be received not later than 5:00 p.m. (CST) on May 10, 2016 (the "Bid Deadline") or such later date or time that the Debtor, in its reasonable discretion, establishes as the Bid Deadline.

H. Auction. If the Debtor receives one or more Qualified Bids, then on May 12, 2016 (the "Auction Date"), beginning at 9:30 a.m. (CST), at Franklin Hayward LLP, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231, or at such other location as may be designated by the Debtor, the Debtor will conduct an auction (the "Auction") to determine the highest or best bid. The Debtor may conduct the Auction in the manner it determines will achieve the maximum recovery for the Debtor's estate. Only the Debtor, Qualified Bidders who have submitted Qualified Bids, and their respective professionals, shall be permitted to attend the Auction, and only Qualified Bidders who have submitted Qualified Bids shall be eligible to participate in (i.e., bid at) the Auction.

I. Auction Process.

The Debtor shall commence the Auction with the Purchase Price from the Purchase Agreement as the initial bid (the "Initial Bid"). Qualified Bidders will be permitted to increase

their bids and to agree to modifications to their bids in order to make their bids more favorable to the Debtor, provided that the first subsequent bid after the Initial Bid shall be at least FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) greater than the Initial Bid and each subsequent bid thereafter shall be at least FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) greater than the preceding bid (the "Incremental Bid Amount"). When evaluating the bids, the Debtor shall consider the financial and contractual terms of each bid and factors affecting the speed and certainty of closing with respect to each bid, provided however, all bids shall be without condition or requirement of any kind other than the conditions and requirements contained in the Purchase Agreement. Such bidding shall continue until the Debtor concludes the Auction of the Property. The Debtor may conduct the Auction and establish any procedures during the Auction as it deems reasonable in its sole and absolute discretion, including, but not limited to, the establishment of timing deadlines for the making of any bids. Bidding at the Auction will be transcribed by a certified court reporter to ensure an accurate recording of the bidding. At the conclusion of the Auction, the Debtor shall identify the highest and best bid (the "Successful Bid"), based upon the foregoing Auction process and the Debtor's determination of the highest or otherwise best bid from a qualified bidder (the "Successful Bidder"). The Debtor shall retain full discretion and right to determine which bid or combination of bids, if any, constitutes the highest or otherwise best offer based on all circumstances, and which bid or combination of bids should be selected as the Successful Bid, all of which are subject to final approval by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code. All bidding shall be conducted at the Auction and no bids shall be tendered or accepted after the Auction has concluded. Any bidder that submits a Qualified Bid that is not selected as the Successful Bid may elect to serve as a "back-up bidder" (each, a "Back-Up Bidder") and to keep its highest bid at the Auction open for acceptance if the Successful Bidder fails to close (each, a "Back-Up Bid") (it being understood that the Debtor shall continue to hold in escrow the Qualified Bidder Deposit of any party serving as a Back-Up Bidder).

J.      Qualified Bid Deposit. Each Qualified Bid Deposit tendered by the Stalking Horse Bidder, the Successful Bidder, or a Back-Up Bidder shall be held in escrow by the Debtor until the earlier of the following (the "Qualified Bid Refund Date"): (i) three (3) business days after the Closing of the Sale; or (ii) forty five (45) days after entry of the Bid Procedures Order. All other Qualified Bid Deposits shall be returned within three (3) business days of the conclusion of the Auction. If the Successful Bidder (defined below) subsequently defaults or breaches, then the Qualified Bid Deposit submitted by such Successful Bidder, together with any accrued interest, shall be deemed forfeited and shall be retained by the Debtor for the benefit of the Debtor's estate. Except as otherwise provided herein, the disposition of the Deposit (as defined in the Purchase Agreement) made by the Stalking Horse Bidder shall be governed by the terms of the Purchase Agreement. If the Stalking Horse Bidder is not the Successful Bidder, then the Stalking Horse Bidder shall automatically be deemed a Back-Up Bidder, and the amount of the Back-Up Bid shall be the amount equal to the Stalking Horse Bidder's last bid amount offered at the Auction.

K.      Hearing Regarding Successful Bid. The hearing to consider approval of the Sale is scheduled for **May 19, 2016 at 2:30 p.m. (CT) (the "Sale Hearing")** in front of the Honorable Mark X. Mullin, United States Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, 501 West Tenth Street, Fort Worth, Texas 76102. The Debtor will request that the Bankruptcy Court approve the Sale

represented by the Successful Bid. The Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. If a bid from a Qualified Bidder is accepted as the Successful Bid but fails to be consummated, the Back-Up Bid shall automatically be deemed the Successful Bid, and the Debtor and the Back-Up Bidder shall be obligated to consummate the transaction on the terms of such Back-Up Bidder's Alternate Purchase Agreement.

## **EXHIBIT 2**

Sale Notice

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FPMC FORT WORTH REALTY** | § | **CASE NO. 15-44791-MXM-11** |
| **PARTNERS, LP,** | § | |
| | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

<u>**NOTICE OF SALE**</u>

     PLEASE TAKE NOTICE THAT on April 20, 2016, FPMC Fort Worth Realty Partners, LP (the "<u>Debtor</u>"), filed a motion [Docket No. __] (the "<u>Motion</u>") with the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") for an order pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") approving, among other things, (a) bid procedures for the sale (the "<u>Sale</u>") of the Debtor's real properties and certain executory contracts and unexpired leases (as more particularly defined in the Purchase Agreement, the "<u>Property</u>"), (b) approving Texas Health Resources (the "<u>Stalking Horse Bidder</u>") as the stalking horse bidder under the terms of that certain the terms of that certain Asset Purchase Agreement dated as of April 20, 2016 (the "<u>Purchase Agreement</u>"), (c) the form and manner of notice of the sale, and (d) certain related relief including the scheduling of the objection deadline and the sale hearing. Please note that all capitalized terms used but not defined herein have the meanings assigned to such terms in the Bid Procedures Order.

     PLEASE TAKE FURTHER NOTICE THAT on April 22, 2016, the Court entered an order [Docket No. ___ ] (the "<u>Bid Procedures Order</u>") approving the form of the Bid Procedures, a copy of which is attached, and setting certain dates and deadlines relating to the Auction, the Sale and the hearing to consider the approval of the Sale (the "<u>Sale Hearing</u>"), as summarized below.

     PLEASE TAKE FURTHER NOTICE THAT any party interested in becoming a Qualified Bidder and seeking additional information from the Debtor may contact the Debtor's counsel as provided below and request a confidentiality agreement (a "<u>Confidentiality Agreement</u>"). Upon execution of a Confidentiality Agreement, parties will be given access to the Debtor's data and may begin conducting due diligence.

                Franklin Hayward LLP
                Attn: Melissa S. Hayward
                10501 N. Central Expy., Ste. 106
                Dallas, Texas 75231
                Phone: 972-755-7104
                Email: MHayward@FranklinHayward.com

PLEASE TAKE FURTHER NOTICE THAT the **"Bid Deadline" is May 10, 2016 at 5:00 p.m. (CST)**. A potential bidder that desires to make a bid for the Property is required to deliver a copy of all the materials required to bid to the Debtor so as to be received not later than the Bid Deadline. The Bid Procedures include contact information for the Debtor and details of the materials that need to be submitted. Any person or entity that does not submit a bid by the Bid Deadline shall not be permitted to participate at the Auction.

PLEASE TAKE FURTHER NOTICE THAT pursuant to the Bid Procedures Order, if the Debtor receives a Qualified Bid (other than the bid by the Stalking Horse Bidder) by the Bid Deadline, **the Debtor shall conduct the Auction on May 12, 2016 at 9:30 a.m. at the offices of Franklin Hayward LLP, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231**, or at such later date and time and at such alternative location as the Debtor may determine or the Court may direct. If the Debtor does not receive at least one Qualified Bid by the Bid Deadline (other than the bid by the Stalking Horse Bidder), the Debtor will not conduct the Auction.

PLEASE TAKE FURTHER NOTICE THAT the **Debtor will seek approval of the Sale at a hearing (the "Sale Hearing") scheduled to be held before the Honorable Mark X. Mullin, United States Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, 501 West Tenth Street, Fort Worth, Texas 76102 at 2:30 p.m. (CST) on May 19, 2016.** The Sale Hearing may be adjourned or rescheduled by the Debtor, from time to time, without notice to creditors or parties in interest other than by an announcement of the adjourned date at the Sale Confirmation Hearing or on the Court's calendar on the date scheduled for the Sale Confirmation Hearing.

PLEASE TAKE FURTHER NOTICE THAT **responses or objections, if any, to the approval of the Sale** must be (i) in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the Bankruptcy Rules and the Local Rules of the Court; (iv) filed with the Court and (v) served on (a) counsel to the Debtor: Franklin Hayward LLP, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231 Attn: Melissa S. Hayward; and (b) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Texas so as to be received **no later than May 17, 2016 at 4:00 p.m. (CST) (the "Objection Deadline")**.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BID PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE ACQUIRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT RELATED THERETO. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT CERTAIN OF THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: April __, 2016.

Respectfully submitted,

/s/  *Melissa S. Hayward*

Melissa S. Hayward
   Texas Bar No. 24044908
   MHayward@FranklinHayward.com
Julian P. Vasek
   Texas Bar No. 24070790
   JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 N. Central Expy., Ste. 106
Dallas, Texas  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**COUNSEL FOR FPMC FORT WORTH
REALTY PARTNERS, LP**

## EXHIBIT 3

Assumption and Assignment Notice

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FPMC FORT WORTH REALTY** | § | **CASE NO. 15-44791-MXM-11** |
| **PARTNERS, LP,** | § | |
| | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

## NOTICE OF (I) DEBTOR'S REQUEST FOR AUTHORITY TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (II) DEBTOR'S PROPOSED CURE AMOUNTS

## TO ALL COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES PLEASE TAKE NOTICE THAT:

PLEASE TAKE NOTICE THAT on April 20, 2016, FPMC Fort Worth Realty Partners, LP (the "Debtor"), filed a motion [Docket No. __] (the "Motion") with the United States Bankruptcy Court for the Northern District of Texas (the "Court") for an order pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 − 1532 (as amended, the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving, among other things (a) the sale of the Debtor's real properties and certain executory contracts and unexpired leases (the "Property"), and (b) procedures for the assumption and assignment of executory and unexpired leases (the "Assigned Contracts").

PLEASE TAKE FURTHER NOTICE THAT on April 22, 2016, the Court entered an order [Docket No. __ ] (the "Bid Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving: (a) the bidding procedures for the Sale of the Property (the "Bid Procedures"); and (b) procedures for the assumption and assignment of Assigned Contracts (the "Assumption and Assignment Procedures"). Copies of the Bid Procedures Order (which incorporates the Assumption and Assignment Procedures and the Bid Procedures) are enclosed herein. Please note that all capitalized terms used but not defined herein have the meanings assigned to such terms in Bid Procedures Order.

PLEASE TAKE FURTHER NOTICE THAT the **Debtor will seek approval of the Sale at a hearing (the "Sale Hearing") scheduled to be held before the Honorable Mark X. Mullin at the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, 501 West Tenth Street, Fort Worth, Texas 76102 at 2:30 p.m. (CST) on May 19, 2016**. The Sale Hearing may be adjourned or rescheduled by the Debtor, from time to time, without notice to creditors or parties in interest other than by an announcement of the adjourned date at the Sale Hearing or on the Court's calendar on the date scheduled for the Sale Hearing.

PLEASE TAKE FURTHER NOTICE THAT upon the closing of the Sale of Property, the Debtor may seek to assume and assign to Texas Health Resources ("the <u>Stalking Horse Bidder</u>") or another Successful Bidder each of the Assigned Contracts set forth on <u>Exhibit A</u> hereto. In addition, the cure amounts, if any, necessary for the assumption and assignment of the Assigned Contracts (the "<u>Cure Amounts</u>") are set forth on Exhibit A.

PLEASE TAKE FURTHER NOTICE THAT as soon as practicable after the conclusion of the Auction, if any party other than the Stalking Horse Bidder is the Successful Bidder, the Debtor shall file with the Court and serve by facsimile, electronic transmission, hand delivery or overnight mail on the contract counterparty (and its attorney, if known) to each Assigned Contract a notice, by no later than three (3) days before the Objection Deadline (defined below): (a) identifying the Successful Bidder; and (b) containing a statement as to the Successful Bidder's ability to perform the Debtor's obligations under the applicable Assigned Contracts.

PLEASE TAKE FURTHER NOTICE THAT **responses or objections, if any, to the assumption and assignment of any Assigned Contract, including, without limitation, any objection to the Debtor's proposed Cure Amount or the provision of adequate assurance of future performance** under any Assigned Contract pursuant to Section 365 of the Bankruptcy Code ("<u>Adequate Assurance</u>") must: (a) comply with the general objection procedures set forth herein; (b) identify the contract(s) or lease(s) to which the objector is party; (c) describe with particularity any cure the claimant contends is required under Section 365 of the Bankruptcy Code (the "<u>Cure Claim</u>") and identify the basis(es) of the alleged Cure Claim under the contract or lease; (d) attach all documents supporting or evidencing the Cure Claim; and (e) if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance. In addition, such responses or objections must be (i) in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the Bankruptcy Rules and the Local Rules of the Court; (iv) filed with the Court and (v) served on (a) counsel to the Debtor: Franklin Hayward LLP, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231 Attn: Melissa S. Hayward; and (b) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Texas, so as to be received **no later than May 17, 2016 at 4:00 p.m. (CST) (the "<u>Objection Deadline</u>")**.

**PARTIES LISTED ON <u>EXHIBIT A</u> HERETO ARE RECEIVING THIS NOTICE BECAUSE THE DEBTOR HAS IDENTIFIED THEM AS A POTENTIAL COUNTERPARTY TO AN ASSIGNED CONTRACT.** Under the terms of the Assumption and Assignment Procedures, if at any time after the entry of the Bid Procedures Order, the Debtor identifies additional prepetition executory contracts and/or leases to be assumed and assigned to the Successful Bidder as Assigned Contracts, the Debtor shall serve a supplemental Assumption and Assignment Notice by facsimile, electronic transmission, hand delivery or overnight mail on the applicable contract counterparty(ies) (and its attorney, if known) to each supplemental Assigned Contract at the last known address available to the Debtor by no later than five (5) days before the Objection Deadline. Such contract counterparty shall have a period from receipt of the supplemental Assumption and Assignment Notice to file with the Court any objection to the proposed cure amount or the assumption and assignment of such contract(s), as applicable, as will be set forth in the supplemental Assumption and Assignment Notice.

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

ANY COUNTERPARTY TO AN ASSIGNED CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A IN ACCORDANCE WITH THE BID PROCEDURES ORDER AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE ASSIGNED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.

Dated: April __, 2016.

Respectfully submitted,

/s/ *Melissa S. Hayward*

Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@FranklinHayward.com
Julian P. Vasek
  Texas Bar No. 24070790
  JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

COUNSEL FOR FPMC FORT WORTH REALTY PARTNERS, LP

## EXHIBIT A

### *Cure Amount Schedule*

| Real Property Leases | |
| --- | --- |
| **Lease Counterparty:** | **Cure Amount:** |
| a.  Medical Office Lease Agreement, together with any amendments thereto (collectively, the "USMD Lease") entered into by and between the Seller and USMD PPM, LLC ("USMD") on or about March 9, 2015 for office space on the First, Second, Third and Fourth floors of the MOB owned by Seller located at 5450 Clearfork Main Street, Fort Worth, Texas 76109 and any guarantees of such lease | $3,392,751.00 |
| b.  Lease agreement entered into by and between Seller and Emergency Medicine Physicians of Collin County and any guarantees of such lease | $0 |
| c.  Lease agreement entered into by and between Seller and One to One and any guarantees of such lease | $0 |
| d.  Lease agreement by and between Seller and Forest Park Medical Center at Fort Worth, LLC for the Hospital and any guarantees of such lease | $0 |
| e.  Lease agreement by and between Seller and Forest Park Medical Center at Fort Worth, LLC for the MOB and any guarantees of such lease | $0 |
| Other Contracts/Leases | |
| **Contract Counterparty:** | **Cure Amount:** |
| 1.  None | $0 |

**EXHIBIT N**

SALE ORDER

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FPMC FORT WORTH REALTY** | § | **Case No. 15-44791-MXM** |
| **PARTNERS, LP,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |

**ORDER AUTHORIZING AND APPROVING (I) SALE OF DEBTOR'S ASSETS FREE**
**AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION**
**AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND**
**(III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[1] [Dkt. No. ___] filed by FPMC Fort

Worth Realty Partners, LP (the "Debtor") seeking entry of an order authorizing and approving,

among other things, the sale (the "Sale") of certain of the Debtor's assets (as detailed in the

Purchase Agreement, the "Property") pursuant to that certain Asset Purchase Agreement dated

April ___, 2016 (as amended, the "Purchase Agreement") attached hereto as Exhibit A by and

between the Debtor and [Purchaser] (the "Purchaser"), and the assumption and assignment of the

---

[1] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion or the Purchase Agreement, as applicable.

---

executory contracts and unexpired leases identified on Exhibit B attached hereto (the "Assigned Contracts"); and this Court having determined that the relief requested in the Motion is in the best interest of the Debtor, its estate, its creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, including for the reasons stated on the record at the hearing seeking approval of the Sale (the "Sale Hearing"):

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.     The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 157 and 1334.  Venue of this Chapter 11 Case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court has the authority to enter this Order pursuant to 11 U.S.C. §§ 363(b) and (f).

B.     The statutory and legal predicates for the relief requested in the Motion are Sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.     Forest Park Medical Center of Fort Worth ("Forest Park FW") is a state-of-the-art, physician-owned surgical hospital facility located in Fort Worth, Texas that opened in 2014. The Debtor owns the real properties (the "Land and Improvements") that constitute Forest Park FW, which includes, among other things, a hospital building, a medical office building, and a parking garage.

D.     The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 30, 2015 (the "Petition Date").

---

[2]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

E.     As of the Petition Date, the Debtor was indebted to Sabra Texas Holdings, LP ("Sabra") pursuant to a loan made to the Debtor by Sabra on or about September 30, 2013 in the original principal amount of $66,801,286.00 (the "Loan"). The Loan is evidenced by, *inter alia*: (i) an *Amended and Restated Secured Promissory Note* dated September 30, 2013 in the original principal sum of sixty six million eight hundred one thousand two hundred eighty six dollars ($66,801,286.00) executed by the Debtor and payable to Sabra Texas Holdings, LP; (ii) an *Amended and Restated Construction Loan Agreement* dated September 30, 2013 by and between the Debtor and Sabra Texas Holdings, LP; and (iii) an *Amended and Restated Deed of Trust, Assignment of Rents and Leases, Security Agreement, Financing Statement and Fixture Filing* by and between the Debtor and Sabra Holdings, LLC dated September 30, 2013 (collectively, the "Loan Documents"). The Loan is secured by substantially all the Debtor's assets and properties whether then owned or thereafter acquired (the "Prepetition Collateral") and is more particularly described in the Loan Documents, including the deed of trust and UCC-1 financing statements ("Prepetition Liens"). The Land and Improvements and the rents received from the operation of the Land and Improvements are the primary collateral for the Loan.

F.     The Debtor also owes unpaid pre-petition property taxes to various taxing authorities with respect to the Land and Improvements for the 2015 tax year.

G.     The Debtor owns good, sufficient, and marketable title to the Property, subject to any and all claims, interests, liens, and encumbrances as may otherwise exist (all such claims, interests, liens, and encumbrances, the "Interests"). Pursuant to all applicable bankruptcy and non-bankruptcy law, the Debtor has the ability and power to transfer title of the Property to the Purchaser.

H.      Pursuant to the terms of the Purchase Agreement, the Purchaser will pay the Debtor a purchase price of $112,000,000 (the "Purchase Price"), subject to any adjustments as provided in the Purchase Agreement. Said consideration is reasonable, fair, and constitutes adequate consideration for the Property, and the Debtor has taken sufficient and adequate steps to maximize such consideration.

I.      The Debtor has exercised sound and appropriate business judgment in negotiating and proposing the sale of the Property. Approval of the sale of the Property in accordance with the terms of the Purchase Agreement is in the best interests of the Debtor's estate.

J.      Due, sufficient, adequate, and appropriate notice of the Motion and sale of the Property in accordance with the terms of the Purchase Agreement has been provided to parties-in-interest in the Bankruptcy Case.

K.      Time is of the essence to the sale of the Property, and to the extent that the relief provided herein is not immediately granted, the Debtor and its estate will suffer immediate and irreparable harm. Accordingly, the waiver of any stay of this Order is appropriate and in the best interests of the Debtor's estates.

L.      In accordance with the provisions of the *Order Approving (A) Bid Procedures, (B) Sale Notice, (C) Assumption and Assignment Procedures, and (D) Scheduling Objection Deadlines, Auction and Sale Hearing* [Dkt. No ___] (the "Bid Procedures Order"), and as evidenced by the certificate of service previously filed with this Court, the Debtor served the Sale Notice [Dkt. ___] (as defined in the Bid Procedures Order), together with a copy of the Bid Procedures Order and the Bid Procedures (as defined in the Bid Procedures Order), on (i) all entities known by the Debtor to have expressed an interest in entering into a transaction involving the Property within the last six (6) months, (ii) all state and local taxing authorities or

recording offices which have a reasonably known interest in the relief requested; (iii) all non-debtor parties to relevant contracts or leases (executory or otherwise); (iv) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Property; (vi) the United States Trustee for the Northern District of Texas; (vii) the 20 largest unsecured creditors of the Debtor; and (viii) all parties that have requested notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure. The notice given by the Debtor of the Motion, the Bid Procedures Order, the Bid Procedures, the Sale Hearing, and the Sale constitutes good and sufficient notice of the relief granted by this Order and no further notice is required. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

M. The Debtor and the Purchaser negotiated, proposed, and entered into the Purchase Agreement without collusion, in good faith, and from arms'-length bargaining positions.

N. The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in Sections 101(31) and 101(2) of the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.

O. The Purchaser is purchasing the Property in good faith and is a good faith Purchaser within the meaning of Section 363(m) of the Bankruptcy Code. The Purchaser proceeded in good faith in connection with all aspects of the Sale. The Purchaser (i) recognized that the Debtor was free to deal with any other party interested in acquiring the Property, (ii) complied with the Bid Procedures Order, and (iii) willingly subjected the bid to the competitive Bid Procedures approved in the Bid Procedures Order. Accordingly, the Purchaser is entitled to

all of the protections afforded under Section 363(m) of the Bankruptcy Code, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Purchaser has otherwise proceeded in good faith in all respects in connection with the Sale specifically and in the Bankruptcy Case generally.

P.     Other parties have had a reasonable opportunity to make a higher or otherwise better offer to purchase the Property, and the Debtor has determined that the Purchase Agreement constituted the highest and best offer for the Property and selected the Purchase Agreement as the Successful Bid.  The Debtor's determination that the Purchase Agreement constitutes the highest and best offer for the Property and the Debtor's selection of the Purchase Agreement as the Successful Bid constitute a valid and sound exercise of the Debtor's business judgment.  The Court's approval of the Motion, the Purchase Agreement, and the transaction maximizes the Debtor's recovery for the Property and thus is in the best interests of the Debtor and its estate, creditors, and all other parties in interest.

Q.     The consideration provided by the Purchaser pursuant to the Purchase Agreement (i) is fair and adequate, (ii) is the highest or otherwise best offer for the Property, (iii) will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under applicable state law.  The Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtor under the Bankruptcy Code or under applicable state law.  Neither the

Debtor nor the Purchaser has entered into the Purchase Agreement or is consummating the Sale with any fraudulent or otherwise improper purpose.

R.       The Purchaser is not a mere continuation of the Debtor or its estate, and there is no continuity of enterprise between the Purchaser and the Debtor.  The Purchaser is not holding itself out to the public as a continuation of the Debtor.  The Purchaser is not a successor to the Debtor or its estate and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtor.  The Purchaser will not have any successor or transferee liability for liabilities, whether known or unknown and whether asserted or unasserted as of the Closing, of the Debtor or any affiliate of the Debtor (whether under federal or state law or otherwise) as a result of the sale of the Property, except with respect to Assumed Liabilities, as such term is defined in the Purchase Agreement.

S.       All parties in interest have the ability and the opportunity to assert claims against the Debtor.

T.       In accordance with the provisions of the Bid Procedures Order, and as evidenced by the certificate of service previously filed with this Court, the Debtor served an Assumption and Assignment Notice (as defined in the Bid Procedures Order) on the Contract Counterparties identified therein that identified, to the extent applicable, (i) the Assigned Contract(s) with such Contract Counterparty; (ii) the name and address of the Contract Counterparty thereto; (iii) notice of the proposed effective date of the assignment (subject to the right of the Debtor to withdraw such request for assumption and assignment of the Assigned Contracts prior to the closing of the Sale); (iv) the Cure Amount (defined below), if any, under such Assigned Contract(s); and (v) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of such Assigned Contract(s).  The notice

given by the Debtor of the assumption and assignment of the Assigned Contracts and the associated Cure Amounts constitutes good and sufficient notice and no further notice is required in connection therewith.

U.     The assumption and assignment of the Assigned Contracts is integral to the Purchase Agreement and is in the best interest of the Debtor, its estate, its creditors, and other parties in interest, and represents the Debtor's reasonable exercise of sound and prudent business judgment. The cure amounts (the "Cure Amounts") set forth on Exhibit B attached hereto are the amounts necessary to cure all monetary defaults and to pay all actual pecuniary losses under the Assigned Contracts under Sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code. The Cure Amounts will be satisfied from the proceeds of the Sale.

V.     The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to Section 365(b)(l)(C) of the Bankruptcy Code.

W.     The consummation of the sale of the Property to the Purchaser and the assumption and assignment of the Assigned Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale. In particular, the Debtor may sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Sections 363(f)(l)-(5) of the Bankruptcy Code have been satisfied. Any party with an interest in the Property who did not object, or who withdrew its objection, to the Sale or the Motion is deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Any party with an Interest in the Property who did object falls within one or more of the other subsections of Section 363(f) of the

Bankruptcy Code and is adequately protected by having its Interest, if any, attach to the net cash proceeds of the Sale ultimately attributable to the Property with the same validity, enforceability, priority, and force and effect as it had against the Property or their proceeds as of the Petition Date.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the Motion that have not been withdrawn, waived, or settled are hereby OVERRULED on the merits, with prejudice, subject to the conditions and protections to certain creditors as expressly provided herein.

3.      Pursuant to Sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtor is immediately authorized to sell and transfer all of the Debtor's right, title and interest in and to the Property to the Purchaser in accordance with the Purchase Agreement (including any ancillary documents) on the Closing Date, and such sale and transfer shall (a) constitute a legal, valid, binding, and effective transfer of the Property, (b) upon the Debtor's receipt of the Purchase Price, vest the Purchaser with all right, title and interest of the Debtor to the Property free and clear of all Interests in and on the Property pursuant to Section 363(f) of the Bankruptcy Code (other than the Permitted Exceptions and the Assumed Liabilities), and (c) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the state in which Seller is incorporated and any other applicable non-bankruptcy laws.

4.      Upon Closing, the Purchaser shall hold title to the Land and Improvements free and clear of all Interests existing immediately prior thereto without need for any release of lien or termination of any UCC financing statement, and this Order shall alone be sufficient to evidence

the same and may be filed with any authority to further evidence the same. Notwithstanding, a certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to cancel any of the Interests of record except the Permitted Exceptions.

5.      Except as otherwise provided in the Purchase Agreement, on and after the Closing, all persons or entities, including, but not limited to, all debt security holders, equity security holders, governmental entities or agencies, homeowner's associations, taxing entities, regulatory authorities, lenders, tort claimants, litigants, trade creditors, laborers, materialmen, municipalities, and other creditors holding Interests of any kind and nature whatsoever against the Debtor or the Property shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim, or other proceeding of any kind, directly or indirectly, against the Purchaser, any affiliates of the Purchaser (as they existed immediately prior to the Closing), or the Property, including any action, claim, or other proceeding seeking to prevent or interfere with the consummation of the Sale, with the retrieval by the Purchaser or the delivery to the Purchaser of possession of the Property, or with any access to or any use, benefit, or enjoyment of the Property by the Purchaser, except with respect to Assumed Liabilities and the Permitted Exceptions. Following the Closing Date, no holder of an Interest in or against the Debtors or the Property shall interfere with the Purchaser's title to or use and enjoyment of the Property based on or related to such Interest, except with respect to Assumed Liabilities and Permitted Exceptions.

6.      Except with respect to Assumed Liabilities or as expressly set forth in the Purchase Agreement or in this order, the Purchaser shall have no liability or responsibility for

any liability or other obligation of the Debtor arising under or related to the Property, and in no event shall the Purchaser have any liability or responsibility for any liabilities of the Debtor. Without limiting the effect or scope of the foregoing, the transfer of the Property from the Debtor to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns to any liability for Interests in or claims (as that term is defined in Bankruptcy Code § 101(5)) against the Debtor or the Property by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions. Neither the Purchaser nor its affiliates, successors, or assigns shall be deemed, as a result of actions taken in connection with the purchase of the Property: (a) to be a successor to the Debtor or (b) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.

7.     Obligations relating to ad valorem taxes for the Property not yet due shall be fulfilled by the Purchaser pursuant to the terms of the Purchase Agreement.

8.     The provisions of this Order are non-severable and mutually dependent.

9.     Upon Closing, any and all Interests in the Property existing immediately prior to the transfer thereof shall attach to the proceeds of the Sale with the same validity, extent, enforceability, priority, and force and effect as they had against the Property or their proceeds as of the Petition Date, subject to any rights, claims and defenses the Debtor or any other party in interests may possess with respect thereto. All holders of Interests in or on the Property are adequately protected by having their Interests attach to the proceeds of the Sale against or in which such Interests are asserted as provided herein.

10.     Upon Closing, this Order (a) shall be effective as a determination that all Interests of any kind or nature whatsoever existing solely with respect to the Property at issue in this Order have been unconditionally released, discharged and terminated, and that the conveyances

described herein have been effected with all such Interests attaching to the proceeds from the Sale in accordance with this Order except as otherwise provided herein, and (b) shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.

11.     Subject to the foregoing paragraph, each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording, and approve as appropriate and/or required by law, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated in the Purchase Agreement.

12.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing claims or Interests with respect to the Property shall not have delivered to the Debtor prior to the closing of the purchase of the Property, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Property, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Property and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall

constitute conclusive evidence of the release of all Interests in the Property of any kind or nature whatsoever.

13.     The reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the sale of the Property to the Purchaser. The Purchaser has entered into the Purchase Agreement in good faith and is a purchaser in good faith of the Property as that term is used in Section 363(m) of the Bankruptcy Code, and, upon the occurrence of the Closing of the purchase of the Property, the Purchaser shall have all of the protections afforded by Bankruptcy Code § 363(m).

14.     Following the Debtor's, Purchaser's, and Sabra's approval of the closing statement for the Sale (the "Closing Statement") prior to the Closing, the Debtor is authorized and directed to utilize and disburse the proceeds of the Sale as set forth in the Closing Statement. At Closing, the proceeds of the Sale shall be distributed to all holders of an Interest in the Land and Improvements in full satisfaction of such Interest as follows:  first, all closing costs; second, the ad valorem property taxes owed to any taxing authority for tax year 2015 and all prior tax years plus interest that has accrued at the state statutory rate of 1% per month from the Petition Date through the date of payment pursuant to 11 U.S.C. Sections 506(b) and 511 (notwithstanding anything in the Motion or this Order to the contrary, the Land and Improvements shall be sold to the Purchaser subject to the liens for the 2016 ad valorem taxes plus all penalties and interest that may accrue, with any current year taxes to be prorated between the Debtor and the Purchaser in accordance with the Purchase Agreement); third, all amounts due and owing to Sabra pursuant to the Loan Documents.  All remaining proceeds of the Purchase Price shall be deposited into the Debtor's debtor-in-possession deposit accounts, with

the exception of the amount required to be escrowed in connection with the cure of the USMD Lease, which shall be escrowed separately.

15.     No broker or party has a claim to any commission, broker's fee, finder's fee, or similar fee from the Sale Proceeds as a result of having negotiated the Purchase Agreement for, or on behalf of, the Debtor or the Purchaser.

16.     Without need for any additional Court order or management approvals, the Debtor, its officers, directors, employees, managers, members, and agents are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the transactions contemplated by the Purchase Agreement for the purchase of the Property only, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the transactions contemplated by the Purchase Agreement for the purchase of the Property only, and to take all further actions as may be reasonably requested by the Purchaser or otherwise required under the Purchase Agreement without further order of this Court for the purchase of the Property only.

17.     The terms of this Order shall be binding on and inure to the benefit of the Debtor, the Purchaser, all creditors and all other parties in interest, and any successors of such parties including, but not limited to, any trustee or examiner with expanded powers appointed in this Chapter 11 Case or upon the conversion of this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.

18.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, the terms of this Order shall be immediately effective and enforceable upon this Order's entry and not subject to any stay, notwithstanding the possible applicability of Bankruptcy Rules 6004(h) and 6006(d) or otherwise.

19.     Pursuant to Sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Purchase Agreement, of the Assigned Contracts is hereby approved, and the requirements of Section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

20.     The Debtor is hereby authorized and directed in accordance with Sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date, the Assigned Contracts, and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts.  The Debtor (in consultation with the Purchaser) may choose to exclude any of the contracts from the list of the Assigned Contracts contained on Exhibit B hereto prior to the Closing Date, in which case such contracts shall not constitute Assigned Contracts and shall not be assumed by the Debtor.  Notwithstanding, any and all unexpired real property leases by and between the Debtor and any tenant of the Land and Improvements shall be assumed and assigned to the Purchaser, and such unexpired real property leases cannot be excluded from the list of the Assigned Contracts contained on Exhibit B.

21.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such contract that prohibits, restricts, or conditions such assignment or transfer pursuant to Section 365(k) of the Bankruptcy Code.  Notwithstanding anything provided herein to the contrary, and as further provided in the Purchase Agreement, the Debtor is not transferring to the Purchaser, and the Purchaser is not acquiring from the Debtor, any and all claims that the Debtor holds against the Hospital Operating Company for unpaid rents due and owing to the

Debtor from prior to the Effective Date of the Purchase Agreement, and the Debtor shall retain all right, title, and interest in any such rents that were due and owing to the Debtor from the Hospital Operating Company from prior to the Effective Date.

22. Upon Closing, the Debtor shall pay the Cure Amounts for the Assigned Contacts, and upon making such payment, all defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in Section 365(b)(2) of the Bankruptcy Code), whether monetary or non-monetary, shall be deemed cured pursuant to Section 365 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the Debtor's deposit of funds into escrow to satisfy the unfunded tenant improvements under the USMD Lease as provided in the Purchase Agreement shall constitute the payment of the Cure Amounts for the USMD Lease, and upon making such payment into escrow, all defaults or other obligations of the Debtor under the USMD Lease arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in Section 365(b)(2) of the Bankruptcy Code), whether monetary or non-monetary, shall be deemed cured pursuant to Section 365 of the Bankruptcy Code

23. To the extent that this Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the Motion in this Chapter 11 Case, the terms of this Order shall govern.

24. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, and each ancillary document executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to

the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Property to the Purchaser, (b) interpret, implement, and enforce the provisions of this Order, (c) protect the Purchaser against any Interests in or against the Debtor or the Property of any kind or nature whatsoever, and (d) enter any orders under Sections 105, 363 or 365 of the Bankruptcy Code with respect to the Assigned Contracts; provided, however, that in the event the Court abstains from exercising or declines to exercise jurisdiction or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

### # # # END OF ORDER # # #

FORM OF ORDER SUBMITTED BY:

Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@FranklinHayward.com
Julian Vasek
  Texas Bar No. 24070790
  JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**ATTORNEYS FOR FPMC FORT WORTH REALTY PARTNERS, LP**

## Exhibit A

Purchase Agreement

**Exhibit B**

Assigned Contracts

| Real Property Leases | |
|---|---|
| **Lease Counterparty:** | **Cure Amount:** |
| a. Medical Office Lease Agreement, together with any amendments thereto (collectively, the "USMD Lease") entered into by and between the Seller and USMD PPM, LLC ("USMD") on or about March 9, 2015 for office space on the First, Second, Third and Fourth floors of the MOB owned by Seller located at 5450 Clearfork Main Street, Fort Worth, Texas 76109 and any guarantees of such lease | $3,392,751.00 |
| b. Lease agreement entered into by and between Seller and Emergency Medicine Physicians of Collin County and any guarantees of such lease | $0 |
| c. Lease agreement entered into by and between Seller and One to One and any guarantees of such lease | $0 |
| d. Lease agreement by and between Seller and Forest Park Medical Center at Fort Worth, LLC for the Hospital and any guarantees of such lease | $0 |
| e. Lease agreement by and between Seller and Forest Park Medical Center at Fort Worth, LLC for the MOB and any guarantees of such lease | $0 |
| **Other Contracts/Leases** | |
| **Contract Counterparty:** | **Cure Amount:** |
| 1. None | $0 |

EXECUTION VERSION

# EXHIBIT O

SALE PROCEDURES MOTION

Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@FranklinHayward.com
Julian P. Vasek
  Texas Bar No. 24070790
  JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**ATTORNEYS FOR FPMC FORT
WORTH REALTY PARTNERS, LP**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **BANKRUPTCY NO. 15-44791-MXM** |
| **FPMC FORT WORTH REALTY** | § | |
| **PARTNERS, LP,** | § | **CHAPTER 11 PROCEEDING** |
| | § | |
| **DEBTOR** | § | |

---

### EMERGENCY MOTION FOR (I) AN ORDER APPROVING (A) BID PROCEDURES, (B) SALE NOTICE, (C) ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (D) SCHEDULING OBJECTION DEADLINES, AUCTION AND SALE HEARING, AND (II) AN ORDER APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS AND ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES

**TO THE HONORABLE MARK X. MULLIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

FPMC Fort Worth Realty Partners, LP (the "Debtor"), the debtor and debtor-in-possession

in the above-captioned case, hereby files this motion (the "Sale Procedures Motion") and asks the

Court to enter an order: (a) approving sale procedures for the sale of the Debtor's real estate and

certain executory contracts and unexpired leases (collectively, and as further defined in the

Purchase Agreement (defined below), the "Property"); (b) establishing bidding procedures,

substantially in the form attached to the Bidding Procedures Order (the "Bidding Procedures") in substantially the form attached hereto as Exhibit 1, to govern the sale of the Property, (ii) scheduling an auction to sell the Property (the "Auction"), (iii) scheduling the hearing to approve the sales contemplated herein (the "Sale Hearing"), and (iv) approving the form and manner of notice of the proposed sale, the Bidding Procedures, the Auction, and the Sale Hearing; and (c) an order, in substantially the form attached hereto as Exhibit 2 (the "Sale Order") (i) authorizing the sale (the "Sale") of the Property to the Purchaser (defined below) or such other successful bidder at the Auction free and clear of all liens, claims, encumbrances, and other interests, (ii) authorizing the assumption and assignment of certain executory contracts and (iii) granting certain related relief. In further support of this Motion, the Debtor respectfully represents as follows:

## I.
## JURISDICTION AND VENUE

1.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

## II.
## BACKGROUND

3.        On November 30, 2016 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case").

4.      The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed by the Office of the United States Trustee for the Northern District of Texas, nor has a trustee or examiner been appointed.

5.      Forest Park Medical Center of Fort Worth ("Forest Park FW") is a state-of-the-art, physician-owned surgical hospital facility located in Fort Worth, Texas that opened in 2014. The Debtor owns the real properties that constitute Forest Park FW, which includes, among other things, a hospital building, a medical office building, and a parking garage (collectively, the "Land and Improvements").

6.      The Debtor leases the entire Forest Park FW hospital and space within the Forest Park FW medical office building to Forest Park Medical Center at Fort Worth LLC (the "Hospital Operating Company") in exchange for the Hospital Operating Company's payment of monthly base rent and operating expense reimbursements[1] (collectively, the "Rent") pursuant to that certain *Medical Office Building Lease* dated November 22, 2013 and that certain *Lease Agreement* dated June 27, 2013 (collectively, the "Hospital Operating Company Leases").[2]   Since the Hospital Operating Company Leases were executed in 2013, the Hospital Operating Company has consistently failed to pay Rent to the Debtor. Indeed, the Hospital Operating Company has not made any payments to the Debtor since February 2015.

7.      Because the Hospital Operating Company has not paid its Rent to the Debtor, the Debtor became unable to make the monthly debt service payments due to its secured creditor, Sabra Texas Holdings, LP ("Sabra"), and Sabra ultimately posted the Property for a December 1, 2015

---

[1] The Hospital Operating Company is obligated to reimburse the Debtor for its pro rata share of the various operating expenses associated with both the hospital and the medical office building, including, *inter alia*, real estate taxes, insurance, security, maintenance, and management fees.
[2] The statements herein are summaries of the applicable leases and reference should be made to the applicable leases for all their terms.

foreclosure. The Debtor accordingly filed a voluntary petition for relief in the Court under chapter 11 of the Bankruptcy Code on November 30, 2015, commencing its bankruptcy case styled and numbered *In re FPMC Fort Worth Realty Partners, LP*; Case No. 15-44791-MXM-11, in order to protect its valuable assets and restructure and reorganize its affairs. Sabra has filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $65,415,848.81 as of the Petition Date.

8.     On January 10, 2016, the Hospital Operating Company filed its own voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing its bankruptcy case styled and numbered *In re Forest Park Medical Center at Fort Worth, LLC*; Case No. 16-40198-RFN-11. In addition to being the largest unsecured creditor in the Hospital Operating Company's bankruptcy case with a prepetition claim of approximately $14 million, the Debtor also holds a continually-increasing administrative claim, which as of the date of this filing totals nearly $3 million, due to the Hospital Operating Company's failure to pay any rent to the Debtor since the Hospital Operating Company's bankruptcy filing.

9.     In addition to its leases with the Hospital Operating Company, the Debtor leases the remaining space in the medical office building to various other tenants, and on March 9, 2015, the Debtor and USMD PPM, LLC executed a Medical Office Lease Agreement (the "USMD Lease") whereby the Debtor agreed to lease office space on the first, second, third and fourth floors of the medical office building to USMD. Under the USMD Lease, the Debtor agreed to pay nearly $3.5 million as a tenant improvement allowance toward USMD's build-out of the spaces it is leasing. The Debtor has not yet funded that obligation, and as a result, the space has not been built-out, nor has USMD taken possession of the leased space. USMD and the Debtor have agreed to abate all deadlines in the USMD Lease to pending the Debtor's decision to assume or reject the USMD Lease in its bankruptcy case.

10.     Since the Petition Date, the Debtor has received numerous expressions of interest to acquire the Property, and in early March 2016, the Debtor entered into a letter of intent (a "LOI") with one particular prospective buyer.   Thereafter, the Debtor and the prospective buyer spent several weeks negotiating a Purchase and Sale Agreement (a "PSA").   Right before the PSA was fully negotiated and ready to be signed, the Debtor received LOIs from two other prospective purchasers on more favorable terms.   After further negotiations, the Debtor executed a new LOI with a second potential purchaser and began to negotiate a PSA with the second potential purchaser. Recently, the Debtor received a new offer to purchase the Property from the first prospective buyer with a meaningfully higher purchase price and otherwise equal terms.

11.     Because the Debtor's potential purchasers continue to increase their previous offers and outbid one another, the Debtor is unable to finally select a purchaser and enter into a PSA for the sale of the Property.   The Debtor has accordingly decided to request that the Court approve bid procedures and an auction so that the Debtor can provide predictability and transparency to the sale process.

12.     On or about April 20, 2016 (the "Effective Date"), the Debtor and Texas Health Resources (the "Purchaser") executed a Purchase and Sale Agreement (the "Purchase Agreement")[3], a true and correct copy of which is attached hereto as Exhibit 3.

13.     Under the Purchase Agreement (and as will be required under any Alternate Purchase Agreement (as defined in the Bid Procedures)), all of the Debtor's real property leases for both the hospital and the medical office building and any underlying guarantees will be assumed and assigned to the Purchaser.   Notwithstanding, the Debtor is not transferring to the Purchaser, and the Purchaser is not acquiring from the Debtor, any and all claims that the Debtor holds against the

---

[3]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Purchase Agreement

Hospital Operating Company for unpaid rents due and owing to the Debtor from prior to the Effective Date, and the Debtor shall retain all right, title, and interest in any such rents that were due and owing to the Debtor from the Hospital Operating Company from prior to the Effective Date. While the Debtor retains its claims against the Hospital Operating Company under the Purchase Agreement, the Purchase Agreement also provides that the Debtor will release those claims at Closing if the Hospital Operating Company executes a mutual release with the Debtor in which both the Debtor and the Hospital Operating Company release one another and each other's affiliates and representatives of any and all claims and causes of action relating to the Hospital Operating Company Leases that either the Debtor or the Hospital Operating Company may hold against the other.

14. The Purchase Agreement further provides that the Debtor shall cure any defaults under any of the leases and executory contracts that are being assumed and assigned to the Purchaser, and specifically with respect to the USMD Lease, the Purchase Agreement provides that the Debtor will deposit money into escrow from the sales proceeds to fund its tenant improvement obligation under the USMD Lease and thereby cure any defaults that exist under the USMD Lease.

15. By this Motion, the Debtor seeks entry of an order in the form attached hereto (the "Bid Procedures Order") approving (a) bid procedures (the "Bid Procedures") for the Sale of the Property; (b) the form and manner of notice of the Sale; (c) the form and manner of notice of the assumption and assignment, including cure amounts, of executory contracts and unexpired leases; and (d) scheduling objection deadlines, an auction, and a final hearing to approve the Sale.

16. By this Motion, the Debtor also seeks entry of an order in the form attached hereto (the "Sale Order") approving the sale of the Property to the Purchaser or such other highest and best bidder (the "Successful Bidder") and authorizing the Debtor to assume and assign certain executory contracts and unexpired leases designated in the Purchase Agreement (collectively, the "Assigned

Contracts")[4] and approval of the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount") as set forth on Exhibit 4 attached hereto.

## III.
## BASIS FOR RELIEF

### A.      Bid Procedures Are Appropriate

17.     Under Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction.  In light of the competing offers that the Debtor has received, the Debtor believes that good cause exists to expose the Property to a competitive bidding process to determine whether any party will make a higher and better offer for the Property, thereby maximizing the benefit to the estate.  Therefore, the Debtor respectfully requests that this Court approve the Bid Procedures.

18.     Upon the Court's entry of the Bid Procedures Order, the Debtor will serve the Bid Procedures Order on certain parties as set forth in the Bid Procedures Order, including all entities known by the Debtor to have expressed an interest in entering into a transaction involving the Property within the last six (6) months.

### B.      The Sale of Assets Is A Product of Debtor's Reasonable Business Judgment .

19.     Under section 363(b)(1) of the Bankruptcy Code, a debtor-in-possession, "after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). "A sale of assets under § 363, as implemented by rule 6004, requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons." *Cadle*

---

[4]      The identification of any contract or lease as an Assigned Contract does not constitute an admission that such contract or lease is an executory contract or unexpired lease and the Debtor reserves its rights in connection with any such finding.

*Company v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010).  In reviewing a proposed sale of assets, a bankruptcy court should give deference to the business judgment of the debtor-in-possession when it deems the sale to be appropriate. *See Esposito v. Title Ins. Co. (In re Fernwood Mkts.)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

20.     Approval of a proposed sale of the debtor's assets outside of the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if the court finds that sound business reasons justify the transaction. *See In re Abbotts Dairies of Pennsylvania*, 788 F.2d 143, 145-147 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).  As more fully articulated by the Fifth Circuit, in deciding whether the decision to sell property of the estate under Section 363(b) is appropriate and satisfies the debtor in possession's fiduciary duty to the debtor, creditors and equity holders, the court must find that there is some articulated business justification for using, selling, or leasing the property outside the ordinary course of business. *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). Ultimately, whether the "proffered business justification is sufficient depends on the case." *Id*.  Sales which maximize value or prevent further diminution of the value of the debtor's estate are appropriate. *Id*.; *In re Dania Corp.*, 400 F.2d 833 (5th Cir. 1968), *cert denied*, 393 U.S. 1118 (1969); *see also In re San Jacinto Glass Indus.*, 93 B.R. 934, 944 (Bankr. S.D.Tex. 1988).  An emergency asset sale is permitted under the statute authorizing the trustee or debtor in possession, after notice and hearing, to sell, other than in the ordinary course of business, property of the estate and such sale need not await either confirmation of a Chapter 11 reorganization plan or conversion to Chapter 7 liquidation. *In re Brookfield Clothes, Inc.*, 31 B.R. 978 (Bankr. S.D.N.Y. 1983).

21.     Section 363 of the Bankruptcy Code does not, however, require the court to substitute its own business judgment for that of the debtor. *See e.g., In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D.

Ohio 1986). Rather, the court should ascertain whether the debtor has articulated a valid business justification for the proposed transaction. *See e.g., Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980); *see also In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr S.D. Fla. 1982). Courts have always been authorized to sell all or substantially all of the debtor's assets outside of the ordinary course of business if the sale is necessary to preserve the value of the assets of the estate and to protect creditors or interest holders. *See Abbotts Diaries*, 788 F.2d 143; *Lionel*, 722 F.2d 1063; *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir.), *cert. denied*, 419 U.S. 964 (1974).

22. Here, the sale of the Property is within the Debtor's sound business judgment. Under the proposed Sale, the sale of the Property will result in the estate receiving the highest and best value for the Property with the least amount of risk of diminution in the value of the estate, and the proposed sale will prevent further interest from accruing on the Debtor's secured loan and will provide ample proceeds to pay all creditors in full and to make distributions to equity holders.

**C.    The Purchaser Should Be Granted the Protection of Bankruptcy Code Section 363(m)**

23. Bankruptcy Code Section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

24. While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted); s*ee generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that a party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); se*e also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (*quoting In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

25.     The Debtor has spent a considerable amount of time and resources negotiating the Purchase Agreement at arms' length, with give and take on both sides.  Under these circumstances, this Court should find in the order approving the sale of the Property that the Purchaser (or the successful Bidder at the auction) is entitled to all of the protections of Bankruptcy Code Section 363(m).

**D.     Sale Should Be Free and Clear of Claims and Interests**

26.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Property free and clear of all claims and interests, except for the Permitted Exceptions and Assumed Liabilities (as such terms are defined in the Purchase Agreement), with such claims and interests to attach to the proceeds of the sale of the Property, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto.

27.     Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
>       (1) applicable nonbankruptcy law permits sale of such

property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that Section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

28.     A sale free and clear of all claims and interests is necessary to maximize the value of the Property. A sale subject to claims and interests would result in a lower purchase price and be of substantially less benefit to the Debtor's estate. A sale free and clear of liens is particularly appropriate under the circumstances because any lien in, to or against the Property that exists immediately prior to the closing of the Sale will either be satisfied at closing or attach to the net sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor or any other party in interest. The Debtor submits that any party with an interest in the Property who does not object, or who withdraws its objection, to the Sale or the Motion should be deemed to consent pursuant to section 363(f)(2) of the Bankruptcy Code. In addition, the Debtor submits that any party with an interest in the Property who does object to the Sale or the Motion will fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and will be adequately protected by having its interest, if any, attach to the net cash proceeds of the Sale ultimately attributable to the Property against or in which it claims an interest.

E. **Assumption and Assignment of Contracts Is Authorized by Bankruptcy Code Section 365**

29.     Bankruptcy Code Sections 365(a) and (b) authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. 11 U.S.C. § 365(a), (b); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996). Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —

>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

>> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

30.     The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See, e.g., In re Grp. of Inst. Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures*

*Corp.*), 4 F.3d 1095, 1098–99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

31.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Paolo Gucci*, 193 B.R. 411, 414 (S.D.N.Y. 1996); *see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet.").

32.     In the present case, the Debtor's assumption and assignment of the Assigned Contracts meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the Sale will provide significant benefits to the Debtor's estate and will enable the Debtor to pay all creditors in full and ultimately make a distribution to the Debtor's equity holders. Because the Debtor cannot obtain the benefits of the Sale without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtor's business judgment.

33.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596,

605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

34. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993).

35. The Purchaser's financial health, reputation, and experience in owning and managing hospitals provide adequate assurance of future performance.

36. In addition, at the Sale Hearing, the Purchaser (or such other Successful Bidder) will demonstrate to the satisfaction of the Court adequate assurance of future performance under the Assigned Contracts. Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

37. The proposed Cure Amounts for the Assigned Contracts are set forth in <u>Exhibit 4</u>. Here, the Cure Amounts will be satisfied at the Closing out of the Sale Proceeds.[5]

**F.** <u>**Notice of Sale Is Good and Adequate**</u>

38. A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections. The Debtor submits that the notice of the Motion and the notices proposed in the Bid Procedures Order complies with Bankruptcy Rules 2002 and 6004(a) and includes information necessary to enable interested parties to either submit an alternative

---

[5] The Debtor will be escrowing funds at closing in order to pay the USMD tenant allowance as provided in the Purchase Agreement.

proposal for the purchase of the Property or object to the sale of the Property.

39.     The Debtor submits that the notice of the Motion and the notices proposed in the Bid Procedures Order constitute good and adequate notice of the terms of the Sale. Therefore, the Debtor respectfully requests the Court find that the notice has provided all parties in interest a reasonable opportunity to object or be heard regarding the relief requested by this Motion.

**G.     Waiver of the Stays Imposed By Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

40.     The Debtor also requests that the Court waive the stays imposed by Bankruptcy Rules 6004(h) and 6006(d). As described above, exigent circumstances exist requiring an expedited sale process. Accordingly, based on the foregoing, it is appropriate to waive the fourteen-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d) under the circumstances.

## IV.
## NOTICE

41.     Notice of this Motion has been or will be provided to the (1) Debtor and the Debtor's professionals; (2) the United States Trustee for the Northern District of Texas; (3) all creditors and interest holders; (4) all parties who requested notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (5) all parties on whom the Court orders notice. The Debtor submits that no further notice of this Motion is required.

42.     The Debtor will be seeking emergency consideration of this Motion.

## V.
## CONCLUSION

BASED UPON THE FOREGOING, the Debtor requests that this Court enter the Bid Procedures Order and the Sale Order in substantially the forms attached hereto authorizing the Debtor to perform the obligations provided for therein and granting such other and further relief as the Court may deem just and proper.

EMERGENCY MOTION FOR (I) AN ORDER APPROVING (A) BID PROCEDURES, (B) SALE NOTICE, (C) ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (D) SCHEDULING OBJECTION DEADLINES, AUCTION AND SALE HEARING, AND (II) AN ORDER APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS AND ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES                                          PAGE 15 OF 16

Dated: April ___, 2016.

### **CERTIFICATE OF SERVICE**

       A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list.

*/s/ Melissa S. Hayward*
Melissa S. Hayward

# EXHIBIT 4

## *Cure Amount Schedule*

| Real Property Leases | |
|---|---|
| **Lease Counterparty:** | **Cure Amount:** |
| a. Medical Office Lease Agreement, together with any amendments thereto (collectively, the "USMD Lease") entered into by and between the Seller and USMD PPM, LLC ("USMD") on or about March 9, 2015 for office space on the First, Second, Third and Fourth floors of the MOB owned by Seller located at 5450 Clearfork Main Street, Fort Worth, Texas 76109 and any guarantees of such lease | $3,392,751.00 |
| b. Lease agreement entered into by and between Seller and Emergency Medicine Physicians of Collin County and any guarantees of such lease | $0 |
| c. Lease agreement entered into by and between Seller and One to One and any guarantees of such lease | $0 |
| d. Lease agreement by and between Seller and Forest Park Medical Center at Fort Worth, LLC for the Hospital and any guarantees of such lease | $0 |
| e. Lease agreement by and between Seller and Forest Park Medical Center at Fort Worth, LLC for the MOB and any guarantees of such lease | $0 |
| Other Contracts/Leases | |
| **Contract Counterparty:** | **Cure Amount:** |
| 1. None | $0 |

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This **FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made and entered into this _____ day of May, 2016 by and between FPMC FORT WORTH REALTY PARTNERS, LP, a Texas limited partnership ("**Seller**"), and TEXAS HEALTH RESOURCES, a Texas nonprofit corporation ("**Purchaser**"). Seller and Purchaser are each referred to herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used herein without definition shall have the meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "**Bankruptcy Code**") on November 30, 2015, in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), Case No. 15-44791;

WHEREAS, Seller and Purchaser entered into the Purchase and Sale Agreement dated as of April 20, 2016 (the "**Purchase Agreement**");

WHEREAS, on April 22, 2016, the Bankruptcy Court entered an order [Docket No. 79] ("**Bid Procedures Order**") approving certain bid procedures for the sale of the assets that are the subject of the Purchase Agreement;

WHEREAS, pursuant to the Bid Procedures Order, the Seller conducted an auction for the sale of its assets and Purchaser was the successful bidder at the auction;

WHEREAS, as a result of the auction, the Parties desire to make certain revisions to the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## AMENDMENTS

1.1     All references to the general partner of the Seller in the Purchase Agreement are revised as follows:  Neal Richards Group Fort Worth Development LLC.

1.2     **Section 2.01**.  This first sentence of Section 2.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

The purchase price to be paid by Purchaser to Seller for the Property is ONE HUNDRED SIXTEEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($116,500,000.00) subject to any credits or apportionments as provided for under this Agreement (the "**Purchase Price**").

1.3     **Section 3.06(a)**.  Section 3.06(a) of the Purchase Agreement is hereby amended to delete the word "and" at the end of clause (iv), replace the period at the end of clause (v) with a semicolon followed by the word "and", and add the following new clause (vi):

(vi)     At Closing, Purchaser shall provide Seller a mutual release substantially in the form attached hereto as Exhibit A (the "**OpCo Mutual Release**") entered into by the Hospital Operating Company that provides that the Seller and the Hospital Operating Company are releasing one another and each Parties' affiliates and representatives of claims and causes of action relating to the Hospital Operating Company Leases or otherwise that either the Seller or the Hospital Operating Company hold against the other and such other terms as the Seller may reasonably request in form and substance satisfactory to Seller.

1.4     **Section 3.06(b)**.  Section 3.06(b) of the Purchase Agreement is hereby amended to delete the word "and" at the end of clause (ix), replace the period at the end of clause (x) with a semicolon followed by the word "and", and add the following new clause (xi):

(xi)     At Closing, Seller shall provide Purchaser a counter-signed OpCo Mutual Release, in form and substance satisfactory to Purchaser.

1.5     **Section 3.09**.  Section 3.06 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "Intentionally Deleted".

## ARTICLE 2
## EFFECT OF AMENDMENT

2.1     **Effectiveness of Amendment**.  This Amendment shall be effective upon, and only upon, (a) Purchaser's and Seller's receipt of a fully-executed copy of this Amendment, and (b) approval of the Purchase Agreement, as amended, by the Bankruptcy Court.

2.2     **Scope of Amendment**.  Except as expressly amended hereby, all of the terms and provisions of the Purchase Agreement shall remain in full force and effect.

2.3     **Relationship to Purchase Agreement**.  On and after the date of this Amendment, each reference in the Purchase Agreement to "this Agreement," "hereunder," "hereof" or words of like import, and each reference to the Purchase Agreement, including by "thereunder," "thereof" or words of like import in any document, shall mean and be a reference to the Purchase Agreement as amended by this Amendment.  Notwithstanding the foregoing, any references to "the date of this Agreement" or similar references shall mean April 20, 2016.

## ARTICLE 3
## MISCELLANEOUS

3.1     **Continuing Effect of Purchase Agreement**.  This Amendment shall not constitute an amendment or waiver of any provision of or schedule to the Purchase Agreement not expressly referred to herein and shall not be construed as an amendment, waiver or consent

to any action on the part of any Party that would require an amendment, waiver or consent of such Party except as expressly stated herein.

3.2 **Governing Law**. This Amendment shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Texas (without giving effect to the principles of conflicts of laws thereof).

3.3 **Counterparts**. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement. This Amendment, and any amendments hereto, to the extent signed and delivered by facsimile (or equivalent electronic transmission), shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

3.4 **Headings**. The article and section headings in this Amendment are for reference purposes only and shall not affect the meaning or interpretation of this Amendment.

3.5 **Severability**. If any term or provision of this Amendment is found to be illegal, invalid or unenforceable, then the Parties hereby waive such term or provision to the extent that it is found to be illegal, invalid or unenforceable and to the extent that to do so would not deprive one of the Parties of the substantial benefit of its bargain. Such term or provision will, to the extent allowable by law and the preceding sentence, not be voided or canceled but will instead be modified so that it becomes enforceable and, as modified, will be enforced as any other term or provision hereof. All other terms and provisions hereof will remain in full force and effect and are to be construed in accordance with the modified term or provision as if such illegal, invalid or unenforceable term or provision had not been contained in this Amendment.

3.6 **Acknowledgment**. Purchaser acknowledges and confirms that as of the date of this Amendment, it has no basis to terminate the Purchase Agreement under Section 7.02(c).

*[The remainder of this page has been left intentionally blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized as of the date first above written.

PURCHASER

**TEXAS HEALTH RESOURCES**,
a Texas non-profit corporation

By: _____
Name: Barclay E. Berdan
Title:   Chief Executive Officer

SELLER

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:     NEAL   RICHARDS   GROUP   FORT   WORTH
        DEVELOPMENT LLC,
        its General Partner

        By:     _____
                Todd Furniss
                Manager

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized as of the date first above written.

PURCHASER

**TEXAS HEALTH RESOURCES**,
a Texas non-profit corporation


By: _____
Name: Barclay E. Berdan
Title:   Chief Executive Officer


SELLER

**FPMC FORT WORTH REALTY PARTNERS, LP**,
a Texas limited partnership


By:    NEAL   RICHARDS   GROUP   FORT   WORTH
        DEVELOPMENT LLC,
        its General Partner


By:    _____
        Todd Furniss
        Manager

## MUTUAL RELEASE AGREEMENT

This *Mutual Release Agreement* (this "**Agreement**") is entered into as of May ____, 2016 by and between FPMC Fort Worth Realty Partners, LP ("**FWRP**") and Forest Park Medical Center at Fort Worth, LLC ("**OpCo**"). FWRP and OpCo shall be collectively referred to as the "**Parties**", and each, a "**Party**".

## BACKGROUND

**WHEREAS**, Forest Park Medical Center of Fort Worth ("**Forest Park FW**") is a state-of-the-art, physician-owned surgical hospital facility located in Fort Worth, Texas that opened in 2014; and

**WHEREAS**, FWRP owns the real properties that constitute Forest Park FW, which include, among other things, a hospital building, a medical office building, and a parking garage; and

**WHEREAS**, FWRP does not actually operate the medical facility at Forest Park FW and instead leases the hospital to OpCo, which operates the hospital in exchange for monthly rent and reimbursement of expenses payable to FWRP pursuant to that certain *Lease Agreement* dated June 27, 2013 (the "**Hospital Lease**"); and

**WHEREAS**, FWRP also leases a portion of the medical office building to OpCo in exchange for monthly rent and reimbursement of expenses payable to FWRP pursuant to that certain *Medical Office Building Lease* dated November 22, 2013 (the "**MOB Lease**", and collectively with the Hospital Lease, the "**OpCo Leases**"); and

**WHEREAS**, on November 30, 2015, FWRP filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "**Bankruptcy Court**"), thereby initiating case number 15-44791-MXM-11 (the "**FWRP Bankruptcy Case**"); and

**WHEREAS**, OpCo filed its own voluntary petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on January 10, 2016, thereby initiating case number 16-40198-rfn11 (the "**OpCo Bankruptcy Case**", and collectively with the FWRP Bankruptcy Case, the "**Bankruptcy Cases**"); and

**WHEREAS**, OpCo has not paid any rent to FWRP since February 2015; and

**WHEREAS**, FWRP asserts in the OpCo Bankruptcy Case: (i) a pre-petition general unsecured claim against OpCo for the unpaid rent due under the OpCo Leases prior to January 10, 2016 in the amount of no less than $13,030,766.08; and (ii) a post-petition administrative claim against OpCo for the unpaid rent due under the OpCo Leases after January 10, 2016 in the amount of no less than $3,894,464.36 (collectively, the "**FWRP Claim**"); and

**WHEREAS**, on April 7, 2016, OpCo filed proof of claim number 5 (the "**OpCo Claim**", and collectively with the FWRP Claim, the "**Claims**") in the FWRP Bankruptcy Case asserting

an unliquidated claim against FWRP that seeks to; (i) avoid the lease between FWRP and OpCo and recover all payments made under the lease; and (ii) disregard the corporate entities between FWRP and OpCo so that FWRP will be liable to all of OpCo's creditors; and

**WHEREAS**, FWRP and OpCo have engaged in good faith discussions to resolve the Claims.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, FWRP and OpCo hereby agree as follows:

## MUTUAL RELEASE TERMS

1. **OpCo Release of FWRP.** OpCo, on behalf of itself and its bankruptcy estate, irrevocably and unconditionally releases and forever discharges FWRP and its bankruptcy estate, and all of its members, officers, employees, agents, representatives, attorneys, affiliates, except for the Excluded Persons defined below, from any and all actions, causes of action, claims, suits, accounts, covenants, debts, demands, agreements, damages, liabilities, or obligations whatsoever of every name and nature, whether at law or in equity, whether in contract or tort or by statute or on any other basis, known or unknown, suspected or unsuspected, which it or its predecessors, successors, and assigns now has, ever had or may hereafter have, including but not limited to the OpCo Claim and any claims whatsoever related to or arising from the OpCo Leases, the OpCo Bankruptcy Case, the FWRP Bankruptcy Case, the FWRP Claim, the OpCo Claim, or otherwise. This release resolves any claim for relief that could have been alleged by Opco and its bankruptcy estate, no matter how characterized, including without limitation, compensatory damages, damages for breach of contract, substantive consolidation claims, alter ego claims, bad faith damages, reliance damages, liquidated damages, punitive damages, costs and attorneys' fees. *Notwithstanding anything to the contrary herein,* this release does not include any actions, causes of action, or claims by Opco or Opco's bankruptcy estate against Dr. Wade Barker, individually, Jefe Plover Interests, Ltd., Vibrant Healthcare Fort Worth, LLC, Vibrant Healthcare Fort Worth Holdings, LLC, FPMC Services, LLC, Todd Furniss, individually, Mary Hatcher, individually, or glendonTodd Investments, LLC (collectively, the "**Excluded Persons**"), including but not limited to the claims asserted by Opco in Adversary Proceeding No. 16-04002-rfn against Jefe Plover Interests, Ltd. or Adversary Proceeding No. 16-04055-rfn against Vibrant Healthcare Fort Worth, LLC; however, this release includes any claims Opco may have against FWRP based on the conduct of FWRP's agents, including the conduct of the Excluded Persons. Moreover, this release includes only those actions, causes of action, and claims against FWRP and its bankruptcy estate, and all of its members, officers, employees, agents, representatives, attorneys, affiliates, except for the Excluded Persons, that belong to and may be asserted by Opco and its bankruptcy estate, and does not include any actions, causes of action, or claims that do not belong to, or could not be asserted by, Opco or its bankruptcy estate.

2. **FWRP Release of OpCo.** FWRP, on behalf of itself and its bankruptcy estate, irrevocably and unconditionally releases and forever discharges OpCo and its bankruptcy estate, and all of its members, officers, employees, agents, representatives, attorneys, affiliates, from any and all actions, causes of action, claims, suits, accounts, covenants, debts, demands,

agreements, damages, liabilities, or obligations whatsoever of every name and nature, whether at law or in equity, whether in contract or tort or by statute or on any other basis, known or unknown, suspected or unsuspected, which it or its predecessors, successors, and assigns now has, ever had or may hereafter have, including but not limited to the FWRP Claim and any claims whatsoever related to or arising from the OpCo Leases, the OpCo Bankruptcy Case, the FWRP Bankruptcy Case, the FWRP Claim, the OpCo Claim, or otherwise. This release resolves any claim for relief that could have been alleged, no matter how characterized, including without limitation, compensatory damages, damages for breach of contract, substantive consolidation claims, alter ego claims, bad faith damages, reliance damages, liquidated damages, punitive damages, costs and attorneys' fees.

3. **Acknowledgement of Resolution.** The Parties acknowledge that: (i) the consideration set forth in this Agreement, which includes but is not limited to, the releases provided herein, is in full resolution of all claims or losses of whatsoever kind or character that they have, or may ever have had, against the other Party; and (ii) by signing this Agreement and accepting the consideration provided herein and the benefits of it, they are relinquishing forever any right to seek further monetary or other relief from the other Party, for any acts of omissions up to and including the date of this Agreement.

4. **No Admission of Liability.** It is understood and agreed by the Parties that this Agreement is a compromise of disputed issues of law and fact, and the terms, covenants, and conditions contained in this Agreement are not to be construed as an admission of liability on the part of any of the Parties, each of which expressly denies liability or fault for any disputed issue asserted in the Bankruptcy Cases or Claims or that could have been asserted in the Bankruptcy Cases or Claims or otherwise. It is expressly understood and agreed that the terms hereof are contractual and not merely recitals and that the agreements herein contained and the consideration transferred is to compromise disputed claims, avoid litigation, and buy peace.

5. **Bankruptcy Court Approval.** This Agreement is subject to approval by the Bankruptcy Court in the Opco Bankruptcy Case and the approval by the Bankruptcy Court in the Propco Bankruptcy Case.

6. **Dismissal of Claims.** The Parties and their respective counsel shall take whatever actions are necessary to ensure that the Claims are withdrawn in their entirety in the Bankruptcy Cases.

7. **Costs Incurred.** Each Party to this Agreement shall bear its own costs and expenses as incurred in the Bankruptcy Cases, including without limitation, attorney's fees, costs of litigation, costs of court, and costs associated with the negotiation and drafting of this Agreement.

8. **Binding Obligation.** It is expressly understood and agreed that this Agreement will be binding on each Party and its successors, heirs, and assigns, including any trustee that may subsequently be appointed in the Bankruptcy Cases, and will inure to the benefit of each Party herein and its successors, heirs, and assigns. It is expressly understood and agreed that this Agreement does not inure to the benefit of any of the Excluded Persons.

9. **Investigation, Legal Counsel, and Free Will.** Each Party to this Agreement represents and warrants that it has made, or had the opportunity to make (and declined to do so), a full and complete investigation of the circumstances and facts surrounding the subjects of this Agreement. Each Party to this Agreement further represents and warrants that it was aided by able legal counsel in its investigation of, and entry into, this Agreement. Each Party to this Agreement further represents and warrants that it executes this Agreement of its own free will. The Parties expressly warrant that no promise or agreement which is not herein expressed has been made to them in executing this Agreement and that none of the Parties is relying upon any statement or representation of any agent of the Parties being released hereby.

10. **Tax and Credit Consequences.** Neither Party makes any representation or warranty regarding the tax consequences, if any, of this Agreement. Each Party is responsible for accurately determining and reporting the tax consequences of the making and/or performance of this Agreement. The Parties further acknowledge and agree (i) that no representations have been made by any other Party or attorney regarding the appropriate tax treatment of any financial benefits or detriments resulting from the making and/or performance of this Agreement, and (ii) that no Party shall have any claim against any other Party or attorney based on or arising from the inaccurate reporting of the tax consequences of the making and/or performance of this Agreement.

11. **Entire Agreement.** This Agreement contains the entire agreement between the Parties regarding the matters set forth herein, and this Agreement supersedes any and all prior agreements, representations, and understandings of the Parties, whether written or oral, that relate to the subject matter hereof.

12. **Amendment and Modification.** This Agreement cannot be amended or modified in any way except in a writing signed by each Party hereto.

13. **Severability.** If any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal, or unenforceable in any respect, and the basis of the bargain between the Parties is not destroyed or rendered ineffective thereby, such invalidity, illegality, or unenforceability, to the extent possible, will not affect any other provision of this Agreement. So far as is reasonable and possible, effect will be given to the intent manifested by the portion held invalid, illegal, or unenforceable.

14. **Governing Law.** This Agreement shall be interpreted in accordance with the laws of the State of Texas, except that any conflict-of-law provision of the State of Texas that may require application of the laws of some other jurisdiction shall be disregarded. The Parties agree that the District Court for the Northern District of Texas shall retain jurisdiction of this matter to resolve any dispute regarding this Agreement.

15. **Representations.** Each Party to this Agreement represents that: (1) it presently owns 100% of the rights it has released herein and that no other person or entity not signing this Agreement has any rights of ownership or control of rights addressed in this Agreement; (2) it has not assigned or otherwise transferred to any person or entity who is not a Party to this Agreement any interest in the rights it has released herein; (3) no person or entity other than it is entitled to assert any right it has released herein; (4) it has the power and authority to enter into

this Agreement; and (5) the signatory to this Agreement has full authority to execute this Agreement on behalf of the stated Party.

16.    **Preparation.** This Agreement has been prepared by the joint efforts of the respective attorneys for each of the Parties.

17.    **Counterparts.** This Agreement may be executed in multiple counterparts or copies and/or on separated signature pages and/or by facsimile transmission, any or all of which, when taken together, shall be deemed an original for all purposes.

18.    **Headings.** Section numbers and titles have been set forth herein for convenience only; no section number or title may limit or extend the meaning or interpretation of any part of this Agreement, nor may any section number or title be used in the construction of any part of this Agreement.

19.    **Effective Date.** The terms of the Agreement will be effective when an executed copy of this Agreement is delivered to counsel for FWRP.

**IN WITNESS WHEREOF**, and intending to be legally bound, each of the Parties hereto has caused this Agreement to be executed as of the date(s) set forth below.

**FPMC FORT WORTH REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK DEVELOPMENT LLC,
its General Partner

By:    _____
Todd Furniss
Manager

Date:    _____

**FOREST PARK MEDICAL CENTER AT FORT WORTH, LLC,**
a Texas limited liability company

By:    _____

Its:    _____

Date:    _____